**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1320
_____

GEORGE ANTHONY ROSS,
Appellant

v.

THE DISTRICT ATTORNEY OF THE COUNTY OF
ALLEGHENY; THE ATTORNEY GENERAL OF THE
STATE OF PENNSYLVANIA; BRIAN V. COLEMAN
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court  No. 2-09-cv-01322
Magistrate Judge: The Honorable Robert C. Mitchell

Argued November 8, 2011

Before: SCIRICA, SMITH, and JORDAN,
*Circuit Judges*

1

(Filed: March 6, 2012)

Diana Stavroulakis (Argued)
262 Elm Court
Pittsburgh, PA  15237
       *Counsel for Appellant*

Leanne K. Shipley (Argued)
Allegheny County Office of District Attorney
436 Grant Street
303 Courthouse
Pittsburgh, PA  15219
       *Counsel for Appellee*

——————————

OPINION

——————————

SMITH, *Circuit Judge.*

In May 2001, petitioner George Anthony Ross was convicted of third degree murder after his third trial on the same charge.  Ross unsuccessfully appealed his conviction and sought relief under Pennsylvania's Post-Conviction Relief Act, 42 Pa. Cons. Stat. §§ 9541-46. Ross then sought federal habeas corpus review under 28 U.S.C. § 2254, raising Constitutional claims under the

Fifth, Sixth, and Fourteenth Amendments. The District Court denied Ross's petition, and we granted a certificate of appealability. Among other issues, Ross argues that his rights under the Confrontation Clause were violated when the trial court admitted prior testimony from an unavailable government witness, even though Ross did not have the opportunity to cross-examine the witness with newly-discovered impeachment evidence. For the following reasons, we conclude that the Confrontation Clause is not the proper avenue for relief on Ross's claim. We will affirm.

## I.

This case arises out of a murder that took place a decade and a half ago. On December 31, 1996, Cheo Stevenson was shot dead while riding in a jitney in the Northside section of Pittsburgh, Pennsylvania. Ross was implicated in the shooting, and was charged with criminal homicide, aggravated assault, and carrying an unlicensed firearm in violation of the Uniform Firearm Act. On June 4, 1997, Ross was tried before a jury in the Allegheny County Court of Common Pleas. On June 6, 1997, Ross's first trial resulted in a mistrial. Ross was re-tried, and on October 30, 1997, a jury found Ross guilty of all three charges. Ross appealed his conviction, and on May 31, 2000, the Superior Court of Pennsylvania granted Ross a new trial. This third trial, which began on May 1, 2001, is the subject of Ross's habeas petition and

the instant appeal.

## A.

At the third trial, the Commonwealth opened its case-in-chief with testimony from Jonathan Smith, who was riding in the jitney along with Stevenson at the time of the shooting. The Commonwealth then called to the stand a series of witnesses who testified about the crime scene, and the results of various laboratory tests that were performed on objects found at the scene.

Finally, the Commonwealth called Randy Erwin to the stand. At the second trial, Erwin had testified that Ross, whom he had met at the Allegheny County Jail, confessed in jail to shooting Stevenson. At the third trial, however, Erwin refused to testify on the ground that he feared retribution if he were to testify. The Commonwealth inquired as to Erwin's willingness to testify, asking whether Erwin would testify if ordered to do so. Erwin repeated that he would refuse to testify:

> Q    Would you explain to the Judge, please, if that is in fact what you would intend to do on [sic] this case, that you would not give any testimony?
>
> A    I will not give any testimony.
>
> Q    And if I call you to the stand while the

4

jury is in the box, can you answer the questions that I pose to you?

A      No, sir -- no, ma'am.

       . . .

Q      And Mr. Erwin, I ask you again if I call you as a witness in this case, do you intend to give testimony against Mr. Ross?

A      No, ma'am.

Trial Tr. at 110:5-12, 112:3-6.

On cross-examination, Erwin suggested that despite his reluctance, he might testify if he was ordered to do so. The Commonwealth clarified this suggestion on re-direct:

Q      . . . [Defense counsel] has now asked you if you're called to the stand and the Judge tells you to testify, are you going to answer the questions that I ask?

A      No, but I didn't understand the way he was putting it. I don't want to be responsible for refusing to the Judge [sic]. I don't know the circumstances behind that, but I don't want to testify in the case.

5

> THE COURT: Let me cut to the heart of this. Mr. Erwin, if the Commonwealth calls you to the [stand], is it your present intention not to respond to any of the questions, correct?
>
> THE WITNESS: Correct.

*Id.* at 117:14-22. Erwin also stated that he suffered a lapse of memory and would not be able to testify even if ordered to do so. *Id.* at 118:16-19.

The trial judge found Erwin unavailable over defense counsel's objection. The unavailability determination having been made, the trial judge allowed Erwin's testimony from the second trial to be read into the record. At this point, defense counsel had failed to proffer any reason why Ross might not have had a full and fair opportunity to cross-examine Erwin at the second trial. [1]

---

[1] At oral argument before this court, Ross's attorney suggested that counsel had, in fact, raised the issue of newly-discovered impeachment evidence, discussed in Part IV.B, *infra*. When pressed on this point, Ross was unable to provide a citation to the record demonstrating this point and requested permission to file a follow-up brief. Ross's follow-up brief, along with an independent

6

After Erwin's testimony was read to the jury, the trial judge permitted the Commonwealth to read into the record Erwin's prior convictions which, under Pennsylvania law, were classified as *crimen falsi* convictions. The Commonwealth read to the jury the date and name of each conviction:

> [Prosecutor]: Thank you, Your Honor. Your Honor, I'll read the date and the crime of crimen falsi.
>
> First on June 10 of 1987, burglary. October 2 of 1987, burglary. On March 25 of 1990, receiving stolen property and retail theft. On April 3 of 1995, receiving stolen property and retail theft. And on May 31 of 1996, two cases of theft. And that would be the extent of the crimen falsi.

---

review of the record, make clear that Ross's counsel misspoke at oral argument. While the record shows that Ross did object to the judge's unavailability determination, it does not indicate on what basis the objection was made. Trial Tr. at 120:10-15. Nothing in the record suggests that Ross raised the issue of newly-discovered impeachment evidence before the trial judge allowed Erwin's prior testimony to be read into the record.

Trial Tr. at 142:17-143:1. The Commonwealth did not include in its list Erwin's prior conviction for making a false report to law enforcement. Nor did Ross's counsel introduce this omitted conviction. The Commonwealth then rested its case.

After presenting testimony from the driver of the jitney in which Stephenson had been riding at the time of the shooting, Ross's counsel requested a sidebar with the trial judge to discuss the admissibility of testimony from Thomas Thornton. Thornton, an inmate who was allegedly housed next to Randy Erwin, was Ross's only remaining witness. Thornton intended to testify that Erwin fabricated his testimony regarding Ross's confession.[2] The trial judge found that Thornton's testimony was inadmissible hearsay under Pennsylvania law and excluded his testimony from trial. With no witnesses left to call, Ross rested his case.

---

[2] Although Ross asserted at trial that Thornton was housed next to Erwin, the record on this point is unclear. The Commonwealth noted at trial that "if you check the computer it appears [Erwin and Thornton] were never lodged in the same prison at the same time, [where] they could have had the opportunity to discuss anything with each other . . . ." Trial Tr. at 172:13-17.

## B.

After closing arguments, the trial judge delivered the jury charge and allowed the jury to deliberate. After approximately two and a half hours of deliberation, the jury indicated to the court tipstaff that it had reached a verdict. Before the verdict could be recorded, however, one juror asked to speak with the trial judge.

The trial judge held an *in camera* conference with the single juror, counsel for both sides, and a court reporter. Ross himself was not present at the conference. At the conference, the juror voiced concerns about retribution should she vote guilty, identifying a spectator at the trial who may have recognized her:

> THE TIPSTAFF: Are you afraid of something happening to you or your family?
>
> [Juror]: . . . I'm just saying that I'm afraid because I know members, people of that sort of background.
>
> THE TIPSTAFF: Do you know people in the courtroom?
>
> [Juror]: There was one guy that was standing outside, I went to school with him and I'm just saying by him knowing me, they could say, well, okay, I know your

9

sister, your sister stood up for jury duty and she testified against a killing of so and so and so and so. . . .

THE COURT:      . . . . What I asked you was whether or not you were fearful of any repercussions.

[Juror]:      I mean, Judge, I am.

. . .

THE TIPSTAFF: Do you think because you were here and you were on this jury that somebody who maybe come [sic] in or out of the courtroom or was associated with this case may do something to someone that you know?

[Juror]:      Of course.

THE TIPSTAFF:  That's what you're afraid of?

[Juror]:      . . . [I]f I was on the jury and they were sitting in the audience . . . if there was somebody . . . that was sitting in the audience that knew me they could say, okay, she made a statement . . . so we're going to make a statement against her.  They go

> hand-in-hand like that. . . . And I just don't want to make a statement against someone that may hurt me. Later on down the line, that's like me putting my foot in my mouth and saying, okay, I'm killing myself.

Trial Tr. at 266:12-268:15; *see also* Trial Tr. at 258:24-259:2; 262:20-21. Throughout this conference, the juror continued to voice her belief that Ross was guilty of the charged crime. *See, e.g.*, Trial Tr. at 254:10-11 ("I feel that he is guilty on his accounts which he was wrong for doing in God's eyes."). The juror never equivocated on the issue of Ross's guilt.

The trial judge reminded the juror several times that her job was to vote to convict or not to convict, regardless of Ross's race. The trial judge also tried to allay the juror's fear of retribution by telling her that no juror in any case he had ever tried had been threatened after delivering a verdict. The trial judge then instructed the juror to return to the courtroom to record the verdict.

After the juror left the *in camera* conference, Ross's counsel moved for a mistrial. The trial judge denied the motion. Counsel, the court reporter, and the trial judge reconvened in the courtroom, with Ross and the twelve jurors present. The jurors, who were individually polled by the court to ensure the verdict was correctly reported, unanimously convicted Ross of third-

11

degree murder.

## C.

Ross timely appealed his conviction. On October 23, 2003, the Superior Court of Pennsylvania affirmed the judgment. The Supreme Court of Pennsylvania denied Ross's petition for allowance of appeal.

Having exhausted his direct appeal, on March 9, 2005, Ross petitioned for relief under Pennsylvania's Post-Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. §§ 9541-46. The PCRA Court denied Ross's petition on the merits. Ross appealed, and the Superior Court of Pennsylvania affirmed. The Supreme Court of Pennsylvania again denied Ross's petition for allowance of appeal.

On September 24, 2009, Ross timely filed for federal habeas relief under 28 U.S.C. § 2254 in the Western District of Pennsylvania. On December 2, 2009, the District Court denied Ross's petition on the merits. The District Court declined to issue a certificate of appealability under 28 U.S.C. § 2241(a).

On August 26, 2010, we granted Ross's application for a certificate of appealability as to three issues relating to Erwin's testimony at the third trial. We also granted a certificate of appealability as to two issues relating to the trial judge's *in camera* conference with the

12

single juror.

## II.

The District Court exercised jurisdiction over Ross's petition under 28 U.S.C. §§ 2241, 2254. We exercise jurisdiction under 28 U.S.C. §§ 1291, 2253. Because the District Court "relied exclusively on the state court record and did not hold an evidentiary hearing, our review is plenary." *Palmer v. Hendricks*, 592 F.3d 386, 392 (3d Cir. 2010). "We review the decision of the state court under the same standard that the District Court was required to apply." *Saranchak v. Beard*, 616 F.3d 292, 301 (3d Cir. 2010).

A district court's authority to review a state court's denial of post-conviction relief is limited by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996). Because the PCRA Court denied Ross's PCRA Petition on the merits, we may grant habeas relief only if the PCRA Court's adjudication of Ross's claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "This is a difficult to meet and highly

deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, --- U.S. ---, 131 S. Ct. 1388, 1398 (2011) (internal quotation marks and citations omitted).

## III.

Ross raises three Sixth Amendment claims arising out of the introduction of Erwin's testimony from the second trial, arguing that: (1) he was denied his rights under the Confrontation Clause when Erwin's prior testimony was read into the record; (2) he was denied his rights under the Confrontation Clause when the trial court excluded Thornton's testimony; and (3) he was denied his right to effective assistance of counsel when trial counsel failed to present evidence of Erwin's *crimen falsi* conviction for making a false report to law enforcement.

## A.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. Under the Confrontation Clause, "[A] witness's testimony against a defendant is [ ] inadmissible unless the witness appears at trial or, if the witness is unavailable, the

14

defendant had a prior opportunity for cross-examination." *Melendez-Diaz v. Massachusetts*, --- U.S. ---, 129 S. Ct. 2527, 2531 (2009). Here, Erwin did not appear at the third trial. In order for his testimony from the second trial to have been admissible: (1) Erwin must have been "unavailable;" and (2) Ross must have "had a prior opportunity for cross-examination."[3] *Id.*

Whether a witness is available to testify is a mixed question of law and fact. *See McCandless v. Vaughn*, 172 F.3d 255, 265 (3d Cir. 1999). The PCRA Court concluded that Erwin refused to testify as a factual matter, and that he was thus unavailable as a matter of law. Ross first argues as a factual matter that Erwin did not actually refuse to testify. Ross points to portions of Erwin's testimony on cross-examination where Erwin suggested that he might, in fact, testify if he were ordered to do so.

The existence of contrary evidence, however, does not render the PCRA Court's determination unreasonable in light of the evidence presented. *See* 28 U.S.C. § 2254(d); *Lambert v. Blackwell*, 387 F.3d 210, 251-52 (3d

---

[3] The Confrontation Clause separately requires that the Government have made a good faith effort to produce the witness at trial. *See Barber v. Page*, 390 U.S. 719, 724-25 (1968). Ross has not questioned the Government's good faith effort in this case.

15

Cir. 2004) (upholding a factual determination by a PCRA Court despite the existence of evidence contradicting the determination). There were ample statements in the record from which the PCRA Court could reasonably have concluded that Erwin would not testify if called to do so. Under AEDPA, it is not the place of a federal court to reweigh the evidence, when the state court's determination is supported by the record. Moreover, on redirect, Erwin explained that he had not understood Ross's questions during cross-examination, and that he would in fact refuse to testify even if ordered to do so. *See* Trial Tr. at 117:14-22.[4]

Ross also argues that the PCRA Court erred as a matter of law by concluding that Erwin's refusal to testify was sufficient to render him unavailable within the meaning of the Confrontation Clause. Rather, Ross argues that the trial court had an obligation to order Erwin to testify under threat of sanctions. Only if Erwin

---

[4] The trial judge's unavailability determination also appears to have been informed by non-verbal cues that the judge was able to observe. For instance, the trial judge stated that he "noticed Mr. Erwin winking at Mr. Ross. They can play all the games they want." Trial Tr. 120:17-19. Under these circumstances, it would be especially inappropriate to overturn the PCRA Court's conclusion based on a few statements in the transcript, considered in isolation.

16

refused to comply with the court order, Ross argues, would he be unavailable for Confrontation Clause purposes.

The Confrontation Clause does not require a witness to face the threat of sanctions in order to be rendered unavailable. A witness is unavailable for Confrontation Clause purposes when he or she refuses to testify, regardless of whether the refusal is in response to an order to testify under threat of sanctions. *See, e.g.*, *United States v. Bell*, 367 F.3d 452, 466 (5th Cir. 2004); *United States v. Reed*, 227 F.3d 763, 767 (7th Cir. 2000); *Jennings v. Maynard*, 946 F.2d 1502, 1505 (10th Cir. 1991); *Rice v. Marshall*, 709 F.2d 1100, 1102 (6th Cir. 1983). Ross points to no Supreme Court precedent to the contrary. The PCRA Court's conclusion thus was not an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

B.

As discussed above, in order for Erwin's testimony from the second trial to have been admissible: (1) Erwin must have been "unavailable" and (2) Ross must have "had a prior opportunity for cross-examination." *Melendez-Diaz*, 129 S. Ct. at 2531. As to the second requirement, the Confrontation Clause requires that a defendant have had "a full and fair opportunity to probe and expose [testimonial] infirmities" of an unavailable

17

government witness in order for that witness's prior testimony to be admissible. *United States v. Owens*, 484 U.S. 554, 558 (1988) (quoting *Delaware v. Fensterer*, 474 U.S. 15 (1985)). Ross argues that he did not have a "full and fair opportunity" to cross-examine Erwin at the second trial because he was unable to question Erwin about Thornton's testimony, and that his rights under the Confrontation Clause were violated when Erwin's testimony was introduced at his third trial.[5]

In *Davis v. Alaska*, 415 U.S. 308 (1974), the Supreme Court held that a defendant may be denied a full and fair opportunity to cross-examine a government witness where the defendant is precluded from showing "why [that witness] might have been biased or otherwise

_____

[5] Ross also takes issue with the trial judge's evidentiary determination that Thornton's testimony was inadmissible under Pennsylvania law. The Supreme Court has "stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" *Swarthout v. Cooke*, --- U.S. ---, 131 S. Ct. 859, 861 (2011) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)). The only issue appropriate for our review is whether Ross was deprived of his constitutional rights. *United States ex rel. Thomas v. Cuyler*, 548 F.2d 460, 464 (3d Cir. 1977). We thus assume that the trial court was correct, and that Thornton's testimony was inadmissible hearsay under Pennsylvania law.

18

lacked that degree of impartiality expected of a witness at trial." *Id.* at 318. In *Delaware v. Fensterer*, 474 U.S. 15 (1985), however, the Supreme Court limited *Davis* and held that the Confrontation Clause was not violated where "the trial court did not limit the scope or nature of defense counsel's cross-examination in any way." *Id.* at 19. *Fensterer* clarified that the Confrontation Clause is not necessarily violated where a defendant is unable to effectively impeach a government witness. Rather, the clause may be violated where a defendant's inability to impeach is attributable to a limitation on the scope or nature of the cross-examination imposed by the trial court.

The Supreme Court bolstered this more limited reading of the Confrontation Clause in *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), holding that "the right to confrontation is a trial right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination." *Id.* at 52. The Supreme Court noted that "[n]ormally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses." *Id.* at 53. Ultimately, the court held, the Confrontation Clause is concerned primarily with "specific statutory or court-imposed restriction[s] at trial on the scope of questioning." *Id.* at 53-54.

19

Other courts of appeals have adopted the vision of the Confrontation Clause expounded in *Fensterer* and *Ritchie*. *See, e.g.*, *United States v. Watson*, 650 F.3d 1084, 1088 (8th Cir. 2011) (declining to find a Confrontation Clause violation where a defendant's inability to cross-examine a witness on a particular point was not attributable to the trial court (citing *Fensterer*, 474 U.S. at 19)); *Middlebrooks v. Bell*, 619 F.3d 526, 542 (6th Cir. 2010) (noting that *Ritchie* held that where "the trial court permit[s a defendant's] attorney to cross examine [a witness] with no limitations aside from routine evidentiary rulings, it [does] not impinge on his confrontation rights"); *Rizzo v. Smith*, 528 F.3d 501, 506 (7th Cir. 2008) (noting that *Ritchie* held that "'the right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination'" (quoting *Ritchie*, 480 U.S. at 52)); *United States v. Mejia*, 448 F.3d 436, 458 (D.C. Cir. 2006) (same); *Dorsey v. Chapman*, 262 F.3d 1181, 1190 (11th Cir. 2001) (declining to find a Confrontation Clause violation where the defendant "was not prohibited from pursuing any line of inquiry, but strategically chose not to").

We agree with our sister circuits, and hold that Ross was not denied a "full and fair opportunity" to cross-examine Erwin. There were no "specific statutory or court-imposed restriction[s] . . . on the scope of

20

questioning" at Ross's second trial. *Ritchie*, 480 U.S. at 53-54. If Ross had discovered Thornton's testimony prior to the second trial, he could have cross-examined Erwin about that testimony. Ross's failure to cross-examine Erwin about Thornton's testimony cannot be attributed to any decision by the court, or statutory limitation on the scope or nature of Erwin's cross-examination at the second trial. Under *Fensterer* and *Ritchie*, Ross had what the Confrontation Clause guaranteed—"an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987) (quoting *Fensterer*, 474 U.S. at 20). Ross's claim is simply not a cognizable Confrontation Clause claim.[6]

We also consider it significant that when the trial judge declared Erwin unavailable, the judge had not been informed of any newly-discovered evidence. Only after

---

[6] Were we to adopt Ross's argument, the prior testimony of any unavailable witness would be rendered inadmissible upon finding any newly-discovered impeachment evidence. If, for example, a critical government witness died before trial, a defendant would merely have to uncover a prior inconsistent statement to render that witness's prior testimony inadmissible. *Fensterer* makes clear that the Confrontation Clause does not require such a result.

21

Erwin had been excused, his testimony had been read into the record, and the Commonwealth had rested its case, did trial counsel raise the issue of Thornton's testimony.[7] The timing of counsel's submission of the issue prevented the trial judge from asking Erwin whether he would be willing to testify specifically about Thornton's testimony, from declaring Erwin available for those purposes, or from allowing trial counsel the opportunity to cross-examine Erwin about the statements he allegedly made to Thornton.

Ross's interpretation of the Confrontation Clause would allow a defendant to place a trial judge in a difficult situation: the judge would either have to declare a mistrial because the defendant's right to confront was violated, or the judge would have to delay trial to recall the Government witness, who may well have been transported back to prison, to testify about the newly-

---

[7] As discussed *supra* in note 1, Ross's attorney suggested at oral argument that trial counsel had indeed raised the issue of Thornton's testimony before the trial judge. The record does not support this claim, nor has Ross's attorney provided any support for this assertion. Nothing in the record suggests that trial counsel so much as hinted to the trial judge of his intent to introduce newly-discovered impeachment evidence, or to argue that Ross was deprived of a full and fair opportunity to cross-examine Erwin at the second trial.

22

discovered evidence. Such a result would encourage defendants to hide any newly-discovered evidence from a trial judge, creating the possibility of a Confrontation Clause violation that might justify reversal later down the line. We decline to allow such gamesmanship where case law requires the opposite result.

This is not to say that a defendant in Ross's situation is somehow frozen in time, precluded from introducing newly-discovered evidence in a later trial. There are other constitutional avenues by which a defendant might introduce such newly-discovered evidence. Ross may have had grounds to bring an ineffective assistance of counsel claim arising out of trial counsel's failure to raise Thornton's testimony earlier at trial. *See Strickland v. Washington*, 466 U.S. 668 (1984). Had trial counsel raised the issue at an appropriate time, he may have been able to elicit from Erwin a statement inconsistent with his alleged statement to Thornton. If counsel had elicited such a statement, Thornton's testimony may have been admissible as extrinsic evidence of Erwin's prior inconsistent statement. *See* Pa. R. Evid. 613(b) ("[E]xtrinsic evidence of a prior inconsistent statement by a witness is admissible only if, during the examination of the witness, . . . the witness is given an opportunity to explain or deny the making of the statement . . . ."), 801(c) ("'Hearsay' is a statement . . . offered in evidence to prove the truth of the matter

asserted."). Instead, trial counsel chose not to raise the issue of Thornton's testimony on the record while the trial judge was considering Erwin's availability.

Additionally, the Due Process Clause guarantees a defendant the "right to have clearly exculpatory evidence presented to the jury, at least when there is no strong countervailing systemic interest that justifies its exclusion[.]" *United States v. Herman*, 589 F.2d 1191, 1204 (3d Cir. 1978). As a result, "a defendant's right to due process can be violated by strict rules of evidence that prevent a defendant from presenting clearly exculpatory evidence to the jury[.]" *United States v. Mike*, 655 F.3d 167, 171 (3d Cir. 2011). A defendant in Ross's situation may be able to petition a trial judge to admit otherwise inadmissible evidence on due process grounds. *See, e.g.*, *United States v. Prochilo*, 629 F.3d 264, 271 (1st Cir. 2011) (rejecting a Confrontation Clause claim regarding newly-discovered impeachment evidence on the ground that "[t]he Supreme Court has thus far only evaluated . . . claims like [the defendant's] under the Due Process Clause of the Fifth and Fourteenth Amendments." (citing *Ritchie*, 480 U.S. at 51-54)). We do not, and cannot, opine on the merits of such claims; Ross has only raised and exhausted his claim under the Confrontation Clause.

Our holding today is limited to the case before us. We hold only that Ross was not denied his Sixth

24

Amendment rights under the Confrontation Clause where Ross's inability to cross-examine Erwin about Thornton's testimony cannot be attributed to a limitation imposed by the trial court or by statute. Ross had a full and fair opportunity to cross-examine Erwin at the second trial within the meaning of the Sixth Amendment. His Confrontation Clause rights were not violated when Erwin's prior testimony was read into the record at his third trial.

## C.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Ross argues that he was denied his Sixth Amendment right to effective assistance of counsel when trial counsel failed to introduce evidence of Erwin's *crimen falsi* conviction for making a false report to law enforcement. Under *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas petitioner claiming a deprivation of his or her Sixth Amendment right to effective assistance of counsel must show that: (1) counsel's performance was deficient; and (2) counsel's deficient performance caused the petitioner prejudice. *Id.* at 687. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ---, 130 S. Ct. 1473, 1485 (2010).

25

To show deficient performance, "a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness. . . . The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Harrington v. Richter*, --- U.S. ---, 131 S. Ct. 770, 787 (2011) (internal quotation marks and citations omitted).

There is no question that counsel's performance was deficient. A *crimen falsi* conviction for false reports is obviously important impeachment evidence, and the Commonwealth concedes as much. There is no apparent strategic reason that might explain or excuse counsel's mistake. Thus, viewed objectively, Ross's counsel unreasonably failed to introduce such impeachment evidence.

In addition to deficient performance, however, Ross must also show prejudice. "With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Richter*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 694). "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, --- U.S. ---,

26

131 S. Ct. 1388, 1403 (2011). "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Richter*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 694). In assessing prejudice, a court "must consider the totality of evidence before the judge or jury." *Strickland*, 466 U.S. at 695.

The PCRA Court concluded that there was no prejudice here because the Commonwealth read into the record Erwin's other *crimen falsi* convictions, which included two convictions for burglary, two convictions for retail theft, two convictions for receiving stolen property, and two convictions for theft. There was not a reasonable probability, the PCRA Court concluded, that reading one more conviction into the record would have led to a different result. Ross argues that Erwin's false reports conviction is more damaging to Erwin's credibility than his other convictions, and so its omission was prejudicial.

A false reporting conviction may well be more prejudicial than any one of Erwin's other convictions. Depending on the facts underlying the conviction, a jury might infer that the similarities between Erwin's previous false report and his report against Erwin implied that Erwin had lied at the second trial. We cannot say, however, that the PCRA's conclusion was an unreasonable application of *Strickland*. The jury was told that Erwin had been convicted of eight separate

27

crimes over a span of ten years. The PCRA Court could reasonably have concluded that the jury already discredited Erwin's testimony to the point where the incremental impact of one additional conviction on Erwin's credibility was minimal. Because the PCRA Court could reasonably have concluded that Ross failed to demonstrate prejudice, they did not unreasonably apply *Strickland*.[8]

## IV.

Ross raises two claims arising out of the trial judge's *in camera* conference with the juror, arguing that: (1) the trial judge denied Ross his right to a fair trial by giving instructions to a single juror; and (2) the trial judge denied Ross his right to be present at the

---

[8] Although Ross mentioned in his brief and at trial that the false reports conviction may have resulted from a situation very close to the testimony he delivered against Ross, the facts of the conviction would not have been disclosed to the jury—they would simply have been told the name of the offense and the date of conviction. The crime of "making a false report to law enforcement" is vague and can be interpreted in different ways. A juror may reasonably conclude that the offense is not particularly damaging as impeachment evidence.

conference.[9]

## A.

Generally, "communications between the court and the jury should be made in the presence of all of the jurors." *United States v. Gullia*, 450 F.2d 777, 779 (3d Cir. 1971). Impermissibly influencing an individual juror may violate a criminal defendant's "Sixth Amendment right to a fair trial before an impartial jury[.]" *United States v. Bertoli*, 40 F.3d 1384, 1392 (3d Cir. 1994). Just because a judge has a conversation with a single juror, however, does not mean that the judge has committed constitutional error. Rather, as we emphasized in *United States v. Rabb*, 450 F.2d 343 (3d Cir. 1971) (per curiam), whether or not the judge's conversation constitutes reversible error depends on the nature of the conversation and the "extent and type" of any additional instructions. *Id.* at 343-44.

---

[9] Ross also raises ineffective assistance of counsel claims arising out of trial counsel's failure to raise these two issues. We have held, however, that "counsel cannot be deemed ineffective for failing to raise a meritless claim." *Werts v. Vaughn*, 228 F.3d 178, 202 (3d Cir. 2000). Because we conclude that Ross's right to be present and to a fair trial were not violated here, Ross's trial counsel was not ineffective for failing to raise those claims.

In *Gullia*, we held that a trial judge erred where he held a conference with a juror who suggested that she might want to hold out and not vote guilty. The trial judge told her that if she held out, "we have just wasted two weeks" and gave the juror extensive, substantive instructions regarding the legal standards at issue in the case. *Gullia*, 450 F.2d at 778-79. In *Rabb*, on the other hand, the judge did not elaborate on the evidence, and merely informed the juror that his recollection of the evidence controlled. *Rabb*, 450 F.2d at 343. As a result, we declined to find reversible error. *Id.*

The trial judge's conference with the juror here is far closer to the conduct upheld in *Rabb*. The judge did not elaborate on any evidence, and repeatedly emphasized that it was the juror's job to weigh the evidence presented at trial to reach a verdict. At no point did the juror, like the juror in *Gullia*, equivocate on the issue of Ross's guilt. Rather, the juror repeated that she believed Ross was guilty, but that she was afraid to deliver a verdict out of fear of retribution.[10] The trial

---

[10] Even if the instructions here were closer to those in *Gullia*, we could not reverse. The PCRA Court concluded that the judge's conversation with the juror was not an "additional instruction" that might justify habeas relief because "there was no communication with the juror as to her thought process [n]or were additional instructions being given." App'x 253. AEDPA only

judge's conversation with the juror did not "directly or indirectly refer to the specifics of the case, [was] collateral to the issues under consideration, and [was] not capable of affecting the deliberative process in any manner." *Truscott v. Chaplin*, 403 F.2d 644, 645 (3d Cir. 1968). The trial court thus did not err by conferencing with the single juror in the absence of the rest of the jury.

B.

Ross argues that he had a constitutional right to be present at the *in camera* conference. The Due Process Clause of the Fifth and Fourteenth Amendments guarantee a criminal defendant the right "to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge."[11] *Stincer*, 482 U.S. at 745

---

allows us to reverse if the PCRA Court's conclusion results, among other things, in an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Ross has pointed to no Supreme Court precedent which was unreasonably applied here.

[11] A similar right to be present exists under the Confrontation Clause of the Sixth Amendment, but that right is implicated only "where the defendant is . . . actually confronting witnesses or evidence against him."

(quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934)). "This does not mean, however, that the defendant has a 'constitutional right to be present at every interaction between a judge and a juror.'" *Bertoli*, 40 F.3d at 1397 (quoting *United States v. Gagnon*, 470 U.S. 522, 526 (1985)). Rather, the defendant's right to be present extends to "any stage of the criminal proceeding that is critical to its outcome if [the defendant's] presence would contribute to the fairness of the procedure." *Stincer*, 482 U.S. at 754. There is no constitutional right to be present "when presence would be useless, or the benefit but a shadow." *Snyder v. Massachusetts*, 291 U.S. 97, 106-07 (1934), *overruled on other grounds in Malloy v. Hogan*, 378 U.S. 1 (1964).

*Gagnon* is instructive. There, a criminal defendant in a multi-defendant trial was seen sketching portraits of the jury during the trial. A juror expressed a safety concern over the incident. The trial judge held an *in camera* conference with the juror, in the presence of counsel for the defendant who was seen sketching the portraits, but excluding the defendants themselves. On appeal, the defendants claimed that they were denied their Fifth Amendment right to be present at the

*United States v. Gagnon*, 470 U.S. 522, 526 (1985). The conference in this case involved no evidence against Ross, and his challenge thus arises strictly out of the Due Process Clause.

32

conference. The Supreme Court disagreed, holding that the defendants' presence "was not required to ensure fundamental fairness or a reasonably substantial . . . opportunity to defend against the charge." *Gagnon*, 470 U.S. at 527 (internal quotation marks omitted).

The Court emphasized that the defendant whose conduct had resulted in the conference had counsel present. *Id.*; *see also United States v. Fernandez-Hernandez*, 652 F.3d 56, 66 (1st Cir. 2011) (finding no Due Process violation where counsel was present at *in camera* conference with juror); *United States v. McCoy*, 8 F.3d 495, 497 (7th Cir. 1993) (same). Additionally, as the court observed, the defendants "could have done nothing had they been at the conference, nor would they have gained anything by attending. Indeed, the presence of [the defendants] . . . could have been counterproductive." *Gagnon*, 470 U.S. at 527; *see also United States v. Peterson*, 385 F.3d 127, 138 (2d Cir. 2004) (finding no due process violation where a defendant's presence at an *in camera* conference "may have prevented juror number three from speaking openly").

The facts here are virtually indistinguishable from *Gagnon*. A juror expressed concerns about her safety. The trial judge held a conference to discuss matters extraneous to the questions at issue at trial. Ross's counsel was present to ensure that nothing prejudicial

33

was said. Ross's presence would not have contributed to the fairness of the proceeding, and may well have been counterproductive, given that the juror was expressing concern about possible retaliation. Ross's Fifth Amendment rights were thus not violated by the trial judge's decision to hold the conference without his presence.[12]

## V.

The writ of habeas corpus "is an extraordinary form of relief and is granted only to remedy constitutional error." *Evans v. Sec'y Pa. Dept. of Corr.*,

---

[12] The PCRA Court and the District Court denied Ross's claim on the basis that the conference with a juror was not a "critical" stage at trial because the jury already indicated it had reached a verdict. Ross argues on appeal that because the verdict had not yet been recorded, the jurors were free to change their minds and so the verdict was not yet final. Ross is correct, and the Commonwealth appears to concede as much. Nonetheless, "we can affirm a judgment on the merits on an alternative basis[.]" *Szuchon v. Lehman*, 273 F.3d 299, 318 n.8 (3d Cir. 2001). Even if the conference was "critical," *Gagnon* makes clear that Ross did not have a Fifth Amendment right to be present at the conference because his presence would not have contributed to the fundamental fairness of the proceeding.

34

645 F.3d 650, 656 (3d Cir. 2011). Ross has not shown that he was deprived of his constitutional rights under the theories that he has advanced. We will affirm.[13]

---

[13] Because we conclude that there was no error, we need not consider whether any errors were harmless.