**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-3804
_____

TAIBU GRANT,

Appellant

v.

MELVIN LOCKETT, Superintendent;
ATTORNEY GENERAL OF THE STATE OF
PENNSYLVANIA
_____

On Appeal from the District Court
for the Western District of Pennsylvania
(No. 2:10-cv-00785)
Magistrate Judge Robert C. Mitchell
_____

Argued on December 20, 2012

Before: McKEE, *Chief Judge*, and SLOVITER, VANASKIE,
*Circuit Judges*.

(Opinion Filed: March 7, 2013)

Roger A. Cox, Esq.  **(ARGUED)**
Cox & Cox
350 Greater Butler Mart
Butler, PA 16001
        *Counsel for Appellant*

Leanne K. Shipley, Esq.  **(ARGUED)**
Allegheny County Office of District Attorney
436 Grant Street
303 Courthouse
Pittsburgh, PA 15219

1

_____

OPINION OF THE COURT
_____

McKee, *Chief Judge*:

Taibu Grant appeals the District Court's denial of the habeas petition he filed under 28 U.S.C. § 2254. We granted a certificate of appealability to allow Grant to appeal the District Court's rejection of his claim of prosecutorial misconduct without holding an evidentiary hearing and his claims of ineffective assistance of counsel. Although we agree with the court's rejection of Grant's prosecutorial misconduct claim, we hold that Grant was denied his Sixth Amendment right to effective assistance of counsel. We will therefore remand to the District Court, which is directed to grant a conditional writ of habeas corpus.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.

Grant was sentenced to life imprisonment after a jury convicted him of the first-degree murder of Keith Gilliam. Gilliam was fatally shot outside the Where It's At Bar (the "Bar") in Pittsburgh, Pennsylvania around midnight on January 8, 1997. That evening, Gilliam picked up his wife from work and then went to the Bar, where they spent about two hours before leaving to return home. As Gilliam was walking to his car, a lone gunman approached him on foot and opened fire just outside the Bar, killing Gilliam and wounding another person, Leo Butler. Four or five minutes later, more shots were fired from a maroon Buick that drove by. Those shots wounded two others in front of the Bar.

Police subsequently gathered fifteen shell casings, four bullets and some bullet fragments from the crime scene. All the shell casings were found in the street, at the intersection of Lincoln and Lemington Avenues. A forensic analysis revealed that all fifteen shell casings had been discharged

2

from the same firearm, but police never recovered the weapon that fired them. A maroon Buick Skylark, matching the description of the car from which the second round of shots was fired, was found after the shooting. Two latent fingerprints were recovered from the car, but neither of them matched Grant's prints. The car had been reported stolen and police questioned Clarence Dumas about the car theft. However, Dumas was not arrested or charged in connection with the car theft or the shooting incident.

Grant was convicted of killing Gilliam based primarily on the testimony of one Commonwealth witness, Christopher Moore. Moore was the only witness who identified Grant as the person who fired the fatal shots at Gilliam. Moore lived in an apartment building about 230 feet from the Bar, on the opposite side of Lincoln Avenue. Moore testified that he heard shots as he was leaving his apartment building that night. When he looked in the direction of the shots, he saw a man in the parking lot of the Open Pantry Food Mart, shooting towards the Bar. The Open Pantry is directly across the street from the Bar. Moore testified that although he could not see the shooter's face, he could see that the shooter was wearing a blue, hooded coat, with what appeared to be a four-inch wide horizontal stripe of a lighter color. Moore testified that he lost sight of the shooter briefly but several minutes later, after Moore walked to the corner of Manning and Montezuma Streets, he saw Grant wearing the same clothing Moore had seen on the shooter. Moore said he heard Grant yell, "I had to let loose on them niggers," to someone standing behind him.

Another prosecution witness, Robert Gilbert, testified that he was heading towards the Bar on the night at issue, and was at Manning and Montezuma Streets when he saw Grant walking towards him in a blue North Carolina jacket. Gilbert's testimony, however, did not directly link Grant to the crime.

No one else identified Grant as the shooter or placed him at the scene of the shooting. On the contrary, eyewitnesses who were in front of the Bar when the shooting took place testified that Grant was not the man who shot Gilliam. Leo Butler was wounded by the first shooter. He

3

testified that the first shooter was standing at a stoplight by Lincoln and Lemington Streets (where the shell casings were later found), and that the shooter was not Grant. Gerald Bonner was in front of the Bar, speaking with Butler, when Gilliam was shot. Bonner also testified that the shooter was not Grant. Two other eyewitnesses — Kim Oden and Mark Gee — were present when Gilliam was killed. Neither was called as a witness at trial, but both later swore in affidavits that they saw the first and second shooter, respectively, and that the shooter was not Grant. Thus, aside from Moore, no one implicated Grant in the shooting.

**B.**

Grant raised a number of issues on direct appeal to the Pennsylvania Superior Court. The Superior Court first denied Grant's petition to have the case remanded to the trial court for an evidentiary hearing on trial counsel's ineffectiveness. However, that court later remanded to the trial court to allow Grant to file a post-sentence motion *nunc pro tunc* challenging the sufficiency of the evidence. The Superior Court otherwise affirmed the trial court and denied Grant's remaining claims. The Pennsylvania Supreme Court subsequently affirmed the Superior Court's decision. In doing so, the Court held for the first time that claims of ineffective assistance of counsel should generally be raised in the first instance in post-conviction proceedings. *See Commonwealth v. Grant*, 813 A. 2d 726 (Pa. 2002).

On remand, the trial court denied Grant's post-sentence *nunc pro tunc* challenge to the sufficiency of the evidence, and the Superior Court subsequently affirmed. Grant then filed a *pro se* petition under the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. § 9541 *et seq.*, in the Court of Common Pleas of Allegheny County (the "PCRA Court"). Counsel was subsequently appointed and Grant's PCRA counsel filed an amended PCRA petition.[1]

---

[1] Grant raised a number of claims in his PCRA petition, but we discuss here only those claims that remain at issue in this appeal.

4

Two of Grant's claims before the PCRA Court relate to Moore's criminal history. Moore had been convicted of a theft and a burglary in 1983. The trial court had excluded any mention of these convictions at trial because they were over ten years old. However, after the trial, Grant discovered that Moore had another burglary conviction in 1983 and two drug convictions in 1993, including one felony drug conviction. Grant also discovered that Moore had been on parole for the 1993 drug convictions when Gilliam was shot and when Moore testified as a Commonwealth witness at Grant's trial in 1997.

Grant argued that Moore violated his parole by being at a bar on the night of the shooting and subsequently agreed to testify against Grant in exchange for leniency with respect to his parole violation. In state court, Grant framed the issue of Moore's undisclosed criminal history and parole status as either prosecutorial misconduct under *Brady v. Maryland*, 373 U.S. 83 (1963), or ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). The Superior Court denied Grant's *Brady* claim because Grant's lawyer could have discovered Moore's criminal history and parole status with due diligence. *See United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984) ("[T]he government is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself.") (internal quotation marks omitted).

The PCRA Court also denied Grant's claim that trial counsel was ineffective for failing to fully investigate Moore's criminal history and parole status. The PCRA Court based that holding on its belief that Grant had not presented any evidence that Moore was actually on parole during the relevant time periods or that Moore received any favorable treatment by the Commonwealth in exchange for testifying against Grant. The court reasoned that Grant had therefore failed to establish the prejudice required to obtain relief for ineffective assistance of counsel. *See Strickland*, 466 U.S. at 687 ("[T]he defendant must show that counsel's performance was deficient [*and*] that the deficient performance prejudiced the defense.").

5

Grant also argued that trial counsel was ineffective for failing to call Kim Oden and Marc Gee as witnesses. As we will describe in further detail, in a subsequent affidavit, Oden affirmed that she saw the first shooter and that shooter was not Grant. Oden's description of the shooter's clothing also contradicted Moore's description of the shooter's clothing. In his post-trial affidavit, Gee swore that he witnessed the shots fired from the Buick, and that the second shooter was not Grant either. The PCRA Court denied relief on this claim because it concluded that Grant had not established that trial counsel knew of the existence of these witnesses or that the witnesses were "ready, willing, and able to testify" at the time of Grant's trial. *Commonwealth v. Grant*, No. CC199701537, at 3-4 (Ct. C.P. Allegheny Cnty. Oct. 2, 2007).

The Superior Court affirmed the PCRA Court's denial of relief on the basis of the PCRA Court's reasoning. *Commonwealth v. Grant*, No. 1581 WDA 2007 (Pa. Super. Ct. Nov. 6, 2008). The Pennsylvania Supreme Court subsequently denied leave to appeal. *Commonwealth v. Grant*, No. 529 WAL 2008 (Pa. Sept. 15, 2009).

Having exhausted his state court remedies, Grant then filed a *pro se* habeas petition under 28 U.S.C. § 2254 in the District Court. As we noted at the outset, the District Court denied Grant's request for an evidentiary hearing on his prosecutorial misconduct claim and affirmed the Superior Court's denial of relief on all of Grant's remaining claims.

The District Court adopted the reasoning of the PCRA court in denying relief on Grant's prosecutorial misconduct and ineffective assistance claims relating to Moore's criminal history and parole status. The District Court rejected Grant's claim that trial counsel was ineffective in not calling Oden and Gee because, *inter alia*, their testimony would have been cumulative, as other witnesses had already testified that Grant was not the shooter. *Grant v. Lockett*, No. 2:10-cv-785, 2010 WL 3259852 (W.D. Pa. Aug. 18, 2010).

A panel of this court subsequently granted a certificate of appealability as to the following three issues:

(1) Whether the Magistrate Judge abused his discretion by denying Grant an evidentiary hearing regarding his claim of prosecutorial misconduct for failure to disclose Christopher Moore's full criminal history;

(2) Whether trial counsel provided ineffective assistance by failing to investigate Moore's criminal history; and

(3) Whether trial counsel provided ineffective assistance by failing to call witnesses Kim Oden and Mark Gee.

## II. STANDARD OF REVIEW[2]

We review the District Court's denial of an evidentiary hearing for abuse of discretion. *Morris v. Beard*, 633 F.3d 185, 193 (3d Cir. 2011). Where, as here, the District Court does not hold an evidentiary hearing and dismisses a habeas petition based on a review of the state court record, we apply a plenary standard of review. *Duncan v. Morgan*, 256 F.3d 189, 196 (3d Cir. 2001). "Accordingly, we will review the state courts' determinations under the same standards that the District Court was required to apply, which are the standard set forth in" the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2241 *et seq. Brown v. Wenerowicz*, 663 F.3d 619, 627 (3d Cir. 2011) (internal quotation marks omitted).

AEDPA places substantial limitations on a federal court's power to grant habeas relief to persons in state custody. Federal courts may only consider petitions that allege that the petitioner is being held in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). AEDPA also requires that "a determination of a factual issue made by a state court shall be

---

[2] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 2241 and 2254(a). This Court has appellate jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a).

7

presumed to be correct" and "[t]he applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Finally, when a state court has adjudicated and rejected a petitioner's federal claim on the merits, the federal court may not grant the writ unless the state court decision "(1) . . . was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d).

"This is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt. The petitioner carries the burden of proof." *Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398 (2011) (citations and internal quotation marks omitted). Moreover, AEDPA's standard applies even where "the state court analyzed and rejected a habeas petitioner's federal claims on the merits but gave 'no indication of how it reached its decision.'" *Han Tak Lee v. Glunt*, 667 F.3d 397, 403 (3d Cir. 2012).

Because the relevant Pennsylvania state court adjudicated Grant's prosecutorial misconduct and ineffective assistance of counsel claims on the merits, the strictures of § 2254(d) govern our review of each of the issues raised here.

### III. DISCUSSION

### A.

Grant claims that he was denied a fair trial as a result of the Commonwealth's failure to disclose Moore's criminal background in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). As we explained above, Moore was the prosecution's key witness and the only witness who identified Grant as the shooter. Grant argued that prosecutors failed to disclose three convictions on Moore's criminal record and failed to disclose that Moore was on parole at the time of the shooting and when he testified against Grant at trial.

8

The District Court agreed with the state court's conclusion that Grant's trial counsel could have discovered Moore's criminal history and parole status with reasonable diligence. Accordingly, the District Court denied Grant's request for an evidentiary hearing on the *Brady* claim and rejected the claim on the merits. We agree that Grant was not entitled to a hearing on this record, and that his *Brady* claim lacked merit. *See Cullen v. Pinholster*, __ U.S. __, 131 S.Ct. 1388 (2011).

In *Pinholster*, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S.Ct. at 1398. Thus, "[if] a claim has been adjudicated on the merits by a state court, a federal habeas petition[er] must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.* at 1400. The petitioner may not introduce new evidence before a federal habeas court. *Id.* In addition, review of a claim under § 2254(d)(2) is specifically limited to "evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). We have recently held that, as a general rule, "district courts cannot conduct evidentiary hearings to supplement the existing state court record under 28 U.S.C. § 2254(d)." *Brown v. Wenerowicz*, 663 F.3d 619, 629 (3d Cir. 2011) (finding *Pinholster* controlling and holding that the district court erred in conducting an evidentiary hearing).

Grant's PCRA counsel was able to discover that Moore was on parole at the time of the shooting and when he testified against Grant. Grant's trial counsel could also have accessed Moore's criminal history through the records kept by the Clerk of Court. Indeed, it appears Grant himself obtained such records while in state custody. It is therefore clear that trial counsel could have discovered Moore's parole status had he exercised reasonable diligence. Accordingly, the District Court did not err in denying Grant's *Brady* claim on the merits without an evidentiary hearing. *See United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984) ("[T]he government is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself.") (internal quotation marks omitted).

9

**B.**

Grant also argues that the Superior Court unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), in rejecting his ineffective assistance claims. Grant first argues that his trial counsel was ineffective for failing to adequately investigate the criminal history and parole status of the Commonwealth's key witness, Christopher Moore. Grant also argues that his trial counsel was ineffective for failing to investigate and call Marc Gee and Kim Oden as defense witnesses.

### 1. AEDPA and *Strickland* Standards

As we have explained, because Grant's ineffective assistance claims were adjudicated on the merits in state court, Grant may obtain federal habeas relief under AEDPA only if the state court decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Pinholster* 131 U.S. at 1398.

A state court's decision is "contrary to . . . clearly established Federal law" under § 2254(d)(1) "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that precedent]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

A state court's decision "involves an unreasonable application[] of clearly established Federal law" where "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Siehl v. Grace*, 561 F.3d 189, 195 (3d Cir. 2009) (internal quotation marks omitted).

The Supreme Court established the legal principles governing Sixth Amendment claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* sets forth a two-part test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.
>
> Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687. "Since *Strickland*, the Supreme Court and this Court have emphasized the necessity of assessing an ineffectiveness claim in light of all the circumstances." *Siehl*, 561 F.3d at 195 (citing cases).

When a federal habeas petition under § 2254 is based upon an ineffective assistance of counsel claim, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Harrington v. Richter*, __ U.S. __, 131 S.Ct. 770, 785 (2011). For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* (internal quotation marks omitted) (emphases in original). "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Id.* Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential." *Pinholster*, 131 S.Ct. at 1403. Federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)." *Id.* (internal quotation marks and citations omitted).

11

## 2. Moore's Criminal History

As noted, the PCRA Court rejected Grant's claim that trial counsel was ineffective for failing to discover Moore's parole status because the court concluded that Grant "provide[d] no documentation that Mr. Moore was in fact on parole during the relevant time period [and] no documentation . . . that would lead anyone to think Mr. Moore was treated in a favorable fashion in return for his cooperation with law enforcement." *Commonwealth v. Grant*, No. CC199701537, at 5 (Ct. C.P. Allegheny Cnty. Oct. 2, 2007). On appeal, the Superior Court affirmed that ruling without further analysis. The Superior Court concluded "that the trial court, in its memorandum and opinion . . . , ably and methodically reviewed the specific instances of alleged ineffectiveness raised by Grant and properly concluded that PCRA relief was not warranted." *Commonwealth v. Grant*, No. 1581 WDA 2007, at 5 (Pa. Super. Ct. Nov. 6, 2008). On habeas review, the District Court similarly quoted the PCRA Court's reasoning and also denied relief without further analysis. *See Grant v. Lockett*, No. 2:10-cv-785, 2010 WL 3259852, at *7 (W.D. Pa. Aug. 18, 2010).

At the outset, we can readily dismiss the PCRA Court's conclusion that Grant submitted no documentation that Moore was on parole during the relevant period. Although this factual conclusion was adopted by the Superior Court on PCRA appeal and the District Court on habeas review, it is clearly an "unreasonable determination of the facts" under 28 U.S.C § 2254(d)(2). The criminal docket sheet and a number of other court documents associated with Moore's 1993 drug convictions were incorporated into the certified record through two PCRA court orders granting leave to supplement the record.[3] The docket sheet in the

[3] On April 8, 2008, the PCRA Court granted leave to supplement the record with documents relating to Moore's 1993 drug convictions. On April 25, 2008, the PCRA Court vacated the April 8, 2008 order and issued a new order to reference the correct case number associated with Moore's convictions.

supplemented record before the Superior Court states that Moore was sentenced to three to six years imprisonment for the convictions at issue, effective August 14, 1992.

Thus, it is beyond dispute that the state record supported Grant's claim that, since Moore was not still in prison at the time of the shooting and Grant's trial in 1997, Moore was on parole during that period. Indeed, to its credit, the Commonwealth conceded this in its answer to Grant's habeas petition before the District Court and its brief on appeal. Thus, despite the Superior Court's proclamation that it "thoroughly reviewed Grant's claims of trial counsel's ineffectiveness" and conducted "a meticulous review of the certified record and the briefs of the parties," the Superior Court affirmed the PCRA Court's denial of relief through a wholesale adoption of that court's reasoning without appreciating, or even realizing, the undisputed fact that the record had been supplemented to include documents establishing Moore's 1993 convictions and resulting parole status. *See Commonwealth v. Grant*, No. 1581 WDA 2007, at 5 (Pa. Super. Ct. Nov. 6, 2008). Rather, the Superior Court's factual determination simply ignored the evidence of Moore's parole status in the supplemented record and the Superior Court's decision, to the extent it relied upon this erroneous determination, "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

The PCRA Court's second basis for denying relief is no less troubling. The PCRA Court reasoned that Grant was not entitled to relief on his ineffective assistance of counsel claim because he presented no evidence that Moore had any deal with the Commonwealth or was otherwise treated favorably in exchange for his cooperation in Grant's trial. Grant does not contend, and there is no indication that, this second basis for the state court's decision is incorrect or was otherwise an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding" under 8 U.S.C. § 2254(d)(2).[4] However, this part of the PCRA

---

[4] Grant filed a *pro se* Motion for Expansion of the Record on May 26, 2011, seeking to present an affidavit signed by Moore on May 16, 2011. The affidavit states that

Court's analysis is clearly an "unreasonable application of" *Strickland* under 28 U.S.C. § 2254(d)(1).

## a. Deficient Performance

The state court does not appear to have ruled on whether trial counsel's performance was deficient. As detailed above, the PCRA Court's analysis of Grant's ineffective assistance claim based on counsel's failure to investigate Moore's criminal history and parole status was sparse. The state court's denial of relief on this claim appears to rest on the court's conclusion that Grant failed to show prejudice because he did not produce evidence of any "deal" offering Moore favorable treatment for testifying against Grant. A "court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697.

However, on this record, it is clear that even if the state court had determined that Grant's trial counsel was *not* deficient in this regard, such a determination would be an unreasonable application of *Strickland*.

Under *Strickland*'s first prong, a court must determine whether, in light of all the circumstances, the identified acts

---

Moore was on parole during Grant's trial. Moore further affirms: "Upon my arrest I was told that the DA new [*sic*] of my parole status, and also new [*sic*] that I was not suppose [*sic*] to be out side [*sic*] at the time of the shooting, and I was told that because of that I better co-operate [*sic*] fully. All of this was discussed prior to Mr. Grant's trial." App. 99. Although this affidavit strongly suggests that Moore was under pressure from prosecutors to testify against Grant, it is not clear that we can now expand the state court record for the purposes of review under §2254(d); "[a]lthough state prisoners may sometimes submit new evidence in federal court" under AEDPA, *Pinholster*, 131 S.Ct. at 1401, we need not address whether the circumstances here warrant admission of new evidence because, as we will explain, we conclude that Grant is entitled to relief even without this new affidavit.

or omissions of counsel were outside the range of professionally competent assistance. *Strickland*, 466 U.S. at 690. *Strickland* also emphasizes that a court's evaluation of an attorney's performance must be "highly deferential" so as to diminish "the distorting effects of hindsight." *Id.* at 689. Thus, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 687-88).

Nonetheless, under *Strickland,* "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. A key prosecution witness's prior criminal history and resultant parole status clearly constitute important impeachment evidence. It is beyond the range of professionally reasonable judgment to forego investigation of, and impeachment based upon, such evidence absent some apparent strategic reason that might explain or excuse counsel's failure. "Thus, viewed objectively, [Grant's] counsel unreasonably failed to introduce such impeachment evidence." *Ross v. Dist. Att'y of the Cnty. of Allegheny*, 672 F.3d 198, 210 (3d Cir. 2012) (holding that trial counsel's failure to introduce evidence of prosecution witness's *crimen falsi* conviction constituted deficient performance). Counsel's failure to make reasonable efforts to learn that Moore was on parole when he testified as the Commonwealth's key witness easily satisfies the first prong of *Strickland*. A conclusion to the contrary would be an unreasonable application of *Strickland*. However, Grant must also satisfy *Strickland*'s prejudice prong.

**b. Prejudice**

To show prejudice, the PCRA Court appears to have required Grant to introduce evidence that Moore had a special deal with, or was treated favorably by, the Commonwealth in exchange for his cooperation. Since no such evidence was

introduced in the PCRA proceedings, the court concluded that the record did not support Grant's claim of ineffective assistance of counsel. We are aware of no requirement that a defendant must introduce evidence of favorable treatment in return for testifying before the witness's subjective motivation for bias becomes relevant.[5] The state court's imposition of such a requirement was an unreasonable application of *Strickland*.

To show prejudice, *Strickland* requires a petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. This requires more than just a "conceivable" likelihood of a different result. *Harrington*, 131 S.Ct. at 792. However, a petitioner "need not show that counsel's deficient performance 'more likely than not altered the outcome of the case' — rather he must show only 'a probability sufficient to undermine confidence in the outcome.'" *Jacobs v. Horn*, 395 F.3d 92, 105 (3d Cir. 2005) (quoting *Strickland*, 466 U.S. at 693-94). Moreover, " [t]he effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial: 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'"

---

[5] We do not suggest that the prosecutor made any offer of favorable treatment to Moore in exchange for his testimony. However, we do suggest that requiring evidence of such an agreement is as unrealistic as it is unreasonable. We doubt that any experienced prosecutor would be so naïve as to expressly promise a witness favorable treatment as a reward for testifying against a defendant at trial. The prosecutor would know that any such promise could be fatal to the witness's credibility upon cross examination by even a modestly competent defense attorney. Although Moore testified that he had such an agreement in his affidavit, we will not attribute such tactics to a prosecutor absent more evidence than appears here. Nevertheless, as we explain below, that is not the point. The poison lurks in the bias that can arise from the witness's subjective state of mind, regardless of whether the witness's belief arose from an actual agreement with, or representation of, the prosecutor.

*Rolan v. Vaugh*, 445 F.3d 671, 682 (3d Cir. 2006) (quoting *United States v. Gray*, 878 F.2d 702, 710-11 (3d Cir. 1989) (quoting *Strickland*, 466 U.S. at 696)).

The Supreme Court's decision in *Davis v. Alaska*, 415 U.S. 308 (1974), is particularly instructive to our analysis of prejudice in Grant's case.  In *Davis*, the Supreme Court held that the Confrontation Clause requires that a criminal defendant be permitted to impeach the credibility of a prosecution witness with that witness's probation status as a juvenile delinquent, even though the state asserted a strong and valid interest in preserving the confidentiality of juvenile delinquency adjudications.  *Id.* at 319.

The defense in *Davis* sought to cross-examine a prosecution witness about his parole status to show that the witness "*might* have been subject to undue pressure from the police and made his identifications under fear of *possible* probation revocation." *Id.* at 311 (emphases added).  Nothing in the Court's discussion or analysis in *Davis* suggests that there was any evidence that the witness actually had some kind of  "deal" or understanding with the prosecutor or that prosecutors had actually coerced the witness to implicate the defendant in exchange for favorable treatment regarding the probation. There was no suggestion of any *quid pro quo*, and the Court's analysis regarding the importance of cross-examining the witness about his parole status did not turn on evidence of any *quid pro quo.*  Moreover, unlike Moore, the witness in *Davis* had actually been cross-examined about possible bias resulting from considerations other than his parole status.  Nevertheless, the Supreme Court held that it was significant that the defense was prevented from "expos[ing] to the jury" the witness's parole status, from which the jurors "could appropriately draw inferences relating to the reliability of the witness." *Id.* at 318.

Although the Supreme Court in *Davis* was resolving a claim under the Confrontation Clause, the Court's analysis of the importance of impeachment based on a witness's parole status is no less relevant to whether Grant established prejudice for the purposes of his Sixth Amendment claim

under *Strickland*.[6]  *Davis* held that the inability to expose a witness's parole status to the jury results in a denial of "the right of effective cross examination, which 'would be constitutional error of the first magnitude.'"  *Id.* at 318.

Accordingly, the Superior Court's conclusion that Grant could not establish prejudice under *Strickland* unless he could show that Moore actually had some kind of deal with the prosecution is an unreasonable application of clearly established Supreme Court precedent.  *Davis* makes clear that, even if there is no evidence of any *quid pro quo* between Moore and the Commonwealth, it is the fact that Moore had a strong reason to lie, and to testify in a manner that would help the prosecutor, in the hopes of getting favorable treatment from the Commonwealth, that establishes the potential bias that would have been extremely compelling impeachment evidence.  Because of trial counsel's unreasonably deficient performance here, the jury was never informed of Moore's parole status and thus "could [not] appropriately draw inferences relating to the reliability of the witness[.]"  *Davis*, 415 U.S. at 318.

As is clear from our discussion of the trial testimony, Moore was not just any Commonwealth witness.  He was the *only* witness to identify Grant as the shooter or otherwise directly implicate Grant in the incident.  The prosecutor's closing argument illustrates the importance of Moore's testimony and also shows that the Commonwealth's entire case rested squarely on the jury's assessment of Moore's credibility and absence of bias.  Thus, the prosecutor quite correctly told the trial court that Moore was "the *most essential* Commonwealth witness[,] [o]ne without [whom] this case probably couldn't proceed."  Trial Tr. 394 (emphasis added).

---

[6]  Indeed, a Confrontation Clause claim would not be viable under the facts of Grant's case as there is no allegation that the *opportunity* for effective cross-examination was in any way curtailed by a specific statutory or court-imposed restriction. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 53-54 (1987) (explaining that the Confrontation Clause is concerned primarily with "specific statutory or court-imposed restriction[s] at trial on the scope of questioning").

18

As we explained earlier, Moore's testimony contradicted at least two other eyewitnesses who said that Grant was not the shooter. These other eyewitnesses, unlike Moore, were actually at the Where It's At Bar when the shooting took place, and were close enough to actually see the shooter's face. Leo Butler testified at trial that the first shooter was standing at the stoplight by Lincoln and Lemington, and that the shooter was not Grant. Gerald Bonner testified at trial that he was in front of the Bar, speaking with Butler, when a man came around the corner and opened fire. Bonner also testified that the shooter was not Grant.[7]

No physical evidence linked Grant to the crime. Neither of the latent prints that were recovered from the Buick that was involved in the shooting matched Grant's prints. If anything, the physical evidence in the case casts doubt on Moore's testimony. Although Moore testified that he saw the shooter firing from the parking lot of the Open Pantry, all fifteen shell casings retrieved from the crime scene were found in the street. No shell casings were found in the Open Pantry parking lot. In addition, there was no evidence that Grant had any motive to kill Gilliam. Indeed, the victim's wife testified that she and her husband knew Grant, and to the best of her knowledge, there was no "bad blood" between them.

Without Moore, it is difficult for us to discern any basis for even charging Grant with the crime. The Commonwealth's closing argument is revealing. Out of thirty pages of transcript, the Commonwealth devoted over ten pages to discussing Moore's testimony and asserted that Moore's testimony *alone* is sufficient evidence to find Grant guilty. Moore's credibility is the indispensable lynchpin of the Commonwealth's case. Accordingly, in its closing

_____

[7] In addition, as we explained, two eyewitnesses, Kim Oden and Marc Gee, were not called to testify at trial, but later swore in affidavits that they saw the first shooter who killed Gilliam and the second shooter who fired out of the maroon Buick, respectively, and Grant was not the shooter in either instance.

argument, the Commonwealth repeatedly argued that the jury should find Moore credible because he had no reason to lie. *See, e.g.*, Trial Tr. 466 ("What reason would Mr. Moore have for getting on the witness stand and . . . telling the fourteen of you that that is the guy that I saw shooting on the corner[?]"); *id.* at 470 ("It can only be construed in that manner . . . back to Mr. Moore's motivation for getting on that witness stand."); *id.* at 474 ("What motivation does Mr. Moore have to want to get up on that witness stand, ladies and gentlemen, and tell you what he saw and tell you how certain he was of what he saw?"); *id.* at 475 ("I submit to you there is no motivation here for [Moore] to get up there because he doesn't want to. . . . Mr. Moore did it, and he got up there and he told you what he saw, and I submit to you that he is completely honest.").

The Commonwealth made these assertions despite the fact that Moore *did* have a very compelling reason to lie. However, because of defense counsel's deficient representation, Moore's reason to lie was never revealed to the jury. The Commonwealth argues that trial counsel did not forego *all* impeachment of Moore, and we agree.[8]   However, the impeachment was limited to Moore's ability to perceive the events. Specifically, trial counsel impeached Moore with the fact that the distance from Moore's apartment to the crime scene was approximately 230 feet and the shooting occurred in the wee hours of the morning, and with the fact that Moore had consumed alcohol prior to witnessing the shooting.

However, the fact that Moore was on parole during all relevant periods, and therefore had a motive to curry the prosecution's favor, was never revealed to the jury. Moore's credibility would have been significantly impugned but for trial counsel's unprofessional errors. Thus, even though defense counsel did not completely forego all attempts to impeach the witness, here, as in *Davis*, the jury could not "make an informed judgment as to the weight to place on

---

[8] As we noted above, the defense counsel in *Davis* also impeached the credibility of the prosecutor's witness. Nonetheless, the Court still held that the failure to introduce evidence of his probation status was a constitutional defect in the proceedings.

[Moore's] testimony which provided 'a critical link in the proof . . . of petitioner's acts.'" *Davis*, 415 U.S. at 318.

As we have explained, "in considering whether a petitioner suffered prejudice, [t]he effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial: 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" *Rolan*, 445 F.3d at 682 (quoting *Gray*, 878 F.2d at 710-11 (quoting *Strickland*, 466 U.S. at 696)). Careful consideration of the totality of the evidence at trial here leaves us with no doubt that had trial counsel performed at an objectively reasonable standard, and had the jury been informed of Moore's parole status and resulting bias, it is "reasonably probable that . . . the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694. Given the omission of that crucial evidence of a possible bias, the confidence in the verdict is greatly undermined.

In fact, had the jury known of Moore's potential for bias, the Commonwealth's closing argument would have been deprived of its force because the jury would have had a compelling response to the Commonwealth's repeated hypothetical questions about why Moore would get on the witness stand and implicate Grant. Even through the deferential lens of federal habeas review of an ineffective assistance of counsel claim, it is clear that the Superior Court's conclusion that Grant failed to show prejudice was an unreasonable application of federal law.

In sum, the Superior Court's conclusion that Grant presented no evidence that Moore was on parole during the relevant time period was an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d)(2). Further, the Superior Court's conclusion that relief was not warranted because Grant presented no evidence that Moore received favorable treatment by the Commonwealth in exchange for his testimony against Grant "involved an unreasonable application of" *Strickland*. *See* 28 U.S.C. § 2254(d)(1). Accordingly, the District Court erred in rejecting Grant's claim that trial counsel provided ineffective assistance in

failing to adequately investigate Moore's criminal history and parole status.

## 2. Witnesses Oden and Gee

Grant also argues that trial counsel was ineffective for failing to investigate and call Mark Gee and Kim Oden as defense witnesses. Gee and Oden worked at the Where It's At Bar and were present at the Bar on the night of the shooting. Grant included affidavits from Gee and Oden with his PCRA petition.

Kim Oden was a bartender at the Bar. According to her affidavit, Oden was standing in front of the Bar, talking to Leo Butler, at approximately 11:00 p.m. on the night that Gilliam was shot. She saw a maroon car drive past the bar and turn the corner. Shortly thereafter, she saw a man walk around the same corner. The man crouched down and began shooting at Oden and Butler. Oden affirmed that the shooter was definitely not Grant and was much taller and heavier than Grant. Oden described the shooter as wearing a black ski mask, a black leather jacket, black pants and black boots. Oden was interviewed by the Pittsburgh Police and told the officers her name and address, and that she had seen the first shooter but did not know or recognize him. She also told the officers that she had not seen Grant that night and did not know where he was. Defense counsel did not interview Oden before Grant's trial.

Marc Gee also worked at the Where It's At Bar. According to his affidavit, Gee was inside the Bar, waiting to begin his bartending shift around 11:00 p.m., when someone came inside and shouted, "Keith is on the ground; there was a maroon car." Gee then went outside and saw a maroon car, with several black men inside, driving down the street in front of the bar. Gee saw a black male in the passenger seat pull out a gun and begin shooting out of the passenger window. Gee affirmed that he had known Grant for about ten years and that the man shooting out of the maroon Buick was definitely not Grant. The shooter was someone Gee had never seen before and had much lighter skin than Grant. Gee was interviewed by police after the shooting and told them his name and address, and that he had seen the person shooting

22

out of the Buick but did not know or recognize him. Gee also spoke with an attorney (presumably the prosecutor), and was subpoenaed to appear at Grant's trial. However, while Gee was waiting in the court hallway, the attorney told him he was not needed and was dismissed.

After reviewing the affidavits from Gee and Oden, and hearing Gee's testimony at an evidentiary hearing,[9] the PCRA Court concluded that Grant's claim with respect to counsel's failure to investigate these witnesses had no merit.[10]

Because we conclude that Grant is entitled to federal habeas relief based on trial counsel's failure to investigate Moore's criminal history and parole status, we need not address whether trial counsel's failure to investigate and call Oden and Gee as defense witnesses independently warrants

---

[9] Gee's testimony was taken for preservation at an evidentiary hearing during Grant's PCRA proceedings. His testimony largely echoes his affidavit.

[10] The PCRA Court explained that, to establish ineffectiveness for failure to call a witness under Pennsylvania law, Grant must show that "(1) the witness existed; (2) the witness was available; (3) counsel [knew] of the [witness's] existence; (4) the witness was prepared to cooperate and testify . . . ; and (5) the absence of the testimony was prejudicial." *Commonwealth v. Khalil*, 806 A.2d 415, 522 (Pa. Super. 2002) (citations omitted). Applying this standard, the PCRA Court denied relief because it concluded that Grant had not established that trial counsel knew of the existence of Oden and Gee or that these witnesses were "ready, willing, and able to testify" at the time of Grant's trial. Although, as we will explain, we need not address whether the state court unreasonably applied *Strickland* in denying relief on these grounds, we are troubled by the state court's requirement that Grant show that Oden and Gee were "ready, willing, and able to testify" at the trial. Absent extenuating circumstances, such as the existence of a privilege or the witness's incapacity or death, whether a witness is ready and willing to testify is irrelevant since defense counsel can compel testimony through a trial subpoena.

relief. Nonetheless, we do note that Oden and Gee's affidavits add to the already significant evidence undermining the verdict against Grant. They also add support to our conclusion that counsel's deficient performance with respect to Moore's parole status prejudiced Grant's defense.

We are particularly troubled by the District Court's conclusion that Grant was not prejudiced by trial counsel's failure to call Oden and Gee because their testimony would have been "cumulative" since other witnesses already testified that Grant was not the shooter. Gee and Oden's affidavits do not provide cumulative testimony on a collateral issue. Rather, the affidavits present *eyewitness* accounts of the *identity of the shooter*. It is hard to understand how having a *third* eyewitness testify that the defendant was not the shooter would have been "cumulative" and therefore inconsequential, as the District Court concludes.

Moreover, Oden's description of the shooter's clothing sharply conflicts with Moore's description of what the shooter was wearing. While Oden described the shooter as wearing a black ski mask, black leather jacket, black pants, and black boots, Moore testified that the shooter was wearing a blue, hooded coat, with a four-inch wide horizontal stripe in a lighter color. Moore was only able to identify Grant as the shooter because he said he saw Grant wearing the same clothes as the person he saw shooting. The fact that Oden, who, unlike Moore, was actually at the scene of the shooting and actually saw the shooter close-up, described the shooter as wearing different clothing further undermines Moore's identification of Grant and the reliability of the resulting verdict.

## IV. CONCLUSION

For the reasons explained above, we will affirm in part and vacate in part the Judgment of the District Court. This matter is remanded to the District Court with instructions to conditionally grant the writ of habeas corpus.

24