PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1657
_____

HORACE BRANCH,

Appellant

v.

CINDY SWEENEY, ASSOCIATE ADMINISTRATOR;
THE ATTORNEY GENERAL OF THE
STATE OF NEW JERSEY
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 2-10-cv-05933)
Honorable Susan D. Wigenton, District Judge
_____

Argued March 24, 2014

BEFORE: FUENTES, GREENBERG, and
VAN ANTWERPEN, <u>Circuit</u> <u>Judges</u>

(Filed: July 9, 2014)
_____

Sean E. Andrussier
Phillip Barber
Melissa Boatner
Adam Garmezy
Elyse Lyons (argued)
Duke University School of Law
Science Drive and Towerview Road
Box 90360
Durham, NC 27708

    <u>Attorneys for Appellant</u>

Carolyn A. Murray
Acting Essex County Prosecutor
Sara A. Friedman (argued)
Essex County Office of Prosecutor
Room 358
50 West Market Street
Essex County Veterans Courthouse
Newark, NJ 07102

    <u>Attorneys for Appellees</u>

_____

OPINION OF THE COURT
_____

GREENBERG, <u>Circuit</u> <u>Judge</u>.

2

## I.  INTRODUCTION

What is more believable: that an experienced criminal would risk his life by attempting to rob armed drug dealers in close quarters, or that while unarmed he would go into a drug den to demand a refund of $50 that he spent at the den for cocaine that he discovered was fake?  And once inside, is it more likely that, while taking open gun fire from behind, he would turn around to shoot back rather than flee, or that he would dive at a weapon about to be discharged at him?  The jury in the criminal trial of the allegedly defrauded habeas corpus petitioner, Horace Branch, the appellant in this case, struggled with these questions.  It sent a stream of notes to the trial court, prompting the court to respond at one point that it "can give you no more than what you heard."  J.A. 330.  In the end, the jury returned a mixed verdict, crediting the part of the prosecution's case charging that Branch shot the victim after entering the premises, but not the part charging Branch with robbing some of the den's occupants at the time of the shooting.

We are not concerned on this appeal from the denial of a petition for habeas corpus with whether the evidence supported the verdict to the extent that the jury found Branch guilty.  But we are concerned with the jury's apparent struggle in reaching its verdict, as well as the questionable theory of the prosecution's case and the questionable character of its shaky witnesses, as these factors are relevant to the question we face today: whether the state courts that reviewed Branch's petition for post-conviction relief ("PCR") unreasonably applied federal law in holding that his trial counsel was not constitutionally ineffective for failing to call two potentially exculpatory

3

witnesses. In particular, Branch anticipated that these witnesses, in testimony consistent with their written sworn pretrial statements, which he claims he passed on to his counsel before the trial, would have corroborated his account of the events at the time of the shooting and alleged robberies. Branch submitted these witnesses' sworn statements to the state PCR court and asked for an evidentiary hearing on his counsel's effectiveness.[1] The PCR court rejected his request and denied Branch relief. Branch appealed, and the Appellate Division of the New Jersey Superior Court affirmed the PCR court's order denying Branch relief with respect to the ineffective assistance of counsel claim before us.

Branch subsequently filed a petition for habeas corpus in the District Court pursuant to 28 U.S.C. § 2254. Without holding an evidentiary hearing, the Court adopted the PCR court's reasoning and, by order of February 11, 2013, denied

[1] In our November 21, 2013 order granting a certificate of appealability, we allowed Branch to expand the record to the extent of permitting him to submit documents filed in the trial level state PCR court, showing that he had raised the precise claim in that court that he later made in the habeas corpus proceedings in the District Court, and that he requested an evidentiary hearing in the state PCR court on his trial counsel's effectiveness. Appellees, who we will call the State, do not contend that Branch's petition is untimely, that Branch has not fully exhausted his state court remedies, or that for any reason he is procedurally barred from raising the issues we address on this appeal.

Branch's petition. In reaching its conclusion, the Court indicated that the proposed witnesses' testimony was "cumulative" and that Branch's trial counsel could have based his decision not to call the witnesses on his trial strategy.

After examining the state-court record, we cannot find any justification for Branch's trial counsel's failure to call the two potential witnesses to testify at Branch's trial. If Branch's counsel had called those witnesses and they adhered to their pretrial written statements, there is a reasonable probability that the relatively balanced scale of evidence at Branch's trial would not have been tilted in the State's favor. The state courts' conclusions that Branch's counsel's representation was not deficient and that his counsel's failure to call the witnesses did not prejudice Branch were unreasonable applications of federal law, and the District Court therefore was required to review Branch's petition de novo. That review, in turn, would have required the Court to hold a hearing to ascertain trial counsel's reasons for not calling the potential witnesses. Because the Court did not take these steps, it abused its discretion, and therefore we will vacate the order of February 11, 2013, denying the petition for habeas corpus and will remand the case to the District Court for further proceedings. We specifically direct the Court to hold an evidentiary hearing to ascertain whether Branch's counsel provided him with ineffective assistance of counsel because he did not call these potential witnesses to testify at trial.

## II. FACTUAL BACKGROUND

5

On November 4, 1993, Branch entered the apartment building at 260 Prince Street in Newark, New Jersey—a premises infested with a criminal element including drug dealers and addicts. At Branch's criminal trial the parties sharply disputed the reason why Branch went to the premises and what happened once he was inside. It is undisputed, however, that Branch had some role in the fatal shooting of Randolph Mosley in the building. It is also undisputed that when the police arrested Branch on the day following the shooting he had possession of the weapon that had been used to kill Mosley.

Branch testified at the criminal trial that he went to 260 Prince Street to retrieve $50 that he had paid for "beat," or fake, cocaine at that premises. He said that he obtained the drugs from Phillip Murphy, who was outside of the building serving as a lookout for drug dealers inside the building. Murphy multi-tasked as he also procured drugs from a dealer inside when a purchaser arrived. Branch determined that the dealer supplying his cocaine gave him a product that was partially baking soda and he wanted a refund of the purchase price. Branch, though he claims to have been unarmed, insisted that he and Murphy go inside the building to get his money back but he soon found out that in the narcotics retail market all sales are final. Upon entering, Branch saw eight to ten people, including Kenneth Dortch, Michael Davis, and Patricia Lee, standing against the walls.

Branch testified that, addressing everyone in the hallway, he asked who had supplied the beat cocaine. Branch contended that Lee responded by pulling out a gun and telling Branch to "get the fuck out of here." J.A. 263. Branch—a slender man of

6

5'5"—rushed the taller Lee to avoid getting shot. Though someone tried to intercept Branch from behind, he managed to get his hands on Lee's wrist. In the ensuing scramble Lee and Branch fell to the floor and, according to Branch, as they fell Lee's gun discharged firing bullets that struck Mosley. Branch claims that when he was on the floor, he overheard Lee remarking that she thought she had shot Mosley. In a critical assertion, he states that Lee dropped her gun at a place within his reach, so he grabbed it and ran out of the building. But Lee obtained a second gun and joined a group of four individuals that chased him down the street. Branch, however, eventually eluded his pursuers and escaped.

Branch called two witnesses who confirmed his account of the events. First, Davis, who was at 260 Prince Street when Branch sought his refund, indirectly corroborated Branch's reason for going inside the building as Davis testified that he, too, had purchased bad cocaine from Lee. Moreover, Davis heard Branch complain to Lee about the "beat" drugs and then saw Lee pull out a gun and start "tussling" with Branch. Davis testified that Lee's gun went off two or three times, and he then ran out of the building.

Branch also called Keith Barnhill, Mosley's childhood friend, as a witness. Although Barnhill was not present at the time of the shooting, he testified that he later had a conversation with Lee in which she largely confirmed Branch's description of Mosley's shooting. Barnhill testified that Lee told him that Branch complained to her about the sale of bad cocaine, that she pulled a gun on him, and that "they got into a struggle." He also testified that Lee "was saying that she thinks she might have

7

shot [Mosley]." J.A. 246-47.

The State called several eyewitnesses who contradicted Branch's account. The collective thrust of their testimony was that Branch went to the building to rob its occupants and ended up shooting and killing Mosley. Murphy stated that Branch came to 260 Prince Street to purchase cocaine and that he, Murphy, went into the building to obtain the cocaine. At that time, instead of paying him for the cocaine, Branch took out a gun, pointed it at Murphy, and told him to lead the way inside. As he entered, Branch exclaimed, "all-right, mother-fuckers, this is a stick-up." J.A. 72. Everyone then followed his command to put their hands up against the wall. According to Murphy, Branch ordered him to get his "stash," thus giving Murphy the opportunity to run upstairs to his apartment. When Murphy got upstairs, he heard gunshots and came down to see Mosley bleeding on the ground. Following the incident, Murphy told one of the investigators that Lee openly wondered if she had shot Mosley.

Dortch supplied additional details. Though his testimony is confusing, we understand that he claimed that he was outside of 260 Prince Street when Branch arrived, and that Branch robbed him of money when he was going inside and took cocaine from Murphy. Dortch testified that when Branch entered the building, he robbed Lee but overlooked her "little" gun ("maybe a .22 or .25[mm]"), J.A. 129-30, which she took out to shoot him; Branch shot back. Like Murphy, Dortch also conceded that Lee originally thought that she had shot Mosley, quoting her saying, "oh, my God, I think I got [Mosley]." J.A. 131-32.

8

The State called Lee and Eddie Ratchford as additional eyewitnesses. Lee, who was a defendant in unrelated pending criminal proceedings, testified for the State in the hope of obtaining favorable treatment in those cases. Lee testified that Branch walked into 260 Prince Street, shooting and demanding drugs. She said that Mosley fled when Branch fired a warning shot as he entered the building. She also testified that while Branch was waiting for delivery of cocaine, he robbed her, taking her jewelry, coat, and money. Lee said that Branch patted her down but did not notice a gun which she then used to shoot at Branch as he was leaving the building. According to Lee, Branch fired back at her, but, instead, hit Mosley who had reentered the building. Lee admitted that she originally thought she had shot Mosley.

The next witness, Ratchford, stated only that he came downstairs from his apartment in the middle of the "stick-up," and that when he exited the elevator, he saw a man with a "big gun" that "[c]ould have been like a nine millimeter." J.A. 207. At first, Ratchford identified that man as Branch to the police, though at trial he said that he did not have an independent recollection of the incident or of the identification he had given.

Although the witnesses testifying to the events at 260 Prince Street for Branch and the prosecution recounted two irreconcilable and confusing versions of the events, they had one thing in common: long records of criminal activity, some involving violent crimes. Inasmuch as the witnesses were asked about their criminal records, the jury was well aware of their criminal backgrounds.

9

In addition to the witnesses from the criminal world, the State offered witnesses from a different milieu. The officer who arrested Branch testified that when he was attempting to arrest Branch, Branch ran from him, fought him, and even tried to pull a weapon as the officer was arresting him. A ballistics expert, Detective Gary Prystauk, explained that the weapon was the nine millimeter gun used to fire the bullets that struck Mosley. Prystauk did not test the gun for fingerprints because it had not been seized immediately after the crime. The State's next witness, Dr. Joan Obe, described the places where the two bullets entered Mosley's body. The first bullet hit Mosley in the chest and passed through multiple organs; the second entered the back of his knee. She testified that at least one of the shots that hit Mosley had not been fired at close range.

The jury, hearing these confusing and conflicting eyewitness accounts and inconclusive expert testimony, quite clearly was torn, and understandably sent a number of questions to the court during deliberations seeking assistance. Thus, it asked why Branch had not been charged with armed robbery of Lee as the jury knew that he had been charged with robbing Mosley, Murphy, and Dortch and there was testimony that he also robbed Lee. It also asked whether Lee had been charged with any crime, whether the police had found the bullets that struck any part of the hallway, and whether it could obtain additional information about Lee. When the New Jersey Supreme Court reviewed the jury's stream of questions on Branch's direct appeal from his convictions, it said that the jury was, "[o]bviously struggling with a cast of characters that included three drug pushers, one of whom was armed with a gun, and a disgruntled drug buyer, who was also said to be

10

armed." State v. Branch, 714 A.2d 918, 923-24 (N.J. 1998).

Despite its apparent reservations, the jury found Branch guilty of a homicide offense in Mosley's killing, as it convicted him, among other crimes, of felony murder, aggravated manslaughter, and resisting arrest. But it acquitted him of purposeful murder and of robbing Mosley, Murphy, and Dortch. In October 2005, after direct state appellate proceedings and two remands of his case to the trial court with results that we need not describe, the trial court sentenced Branch to life in prison for aggravated manslaughter. Branch appealed again but the Appellate Division of the New Jersey Superior Court affirmed the trial court's decision in relevant part. As we have indicated, Branch unsuccessfully sought state PCR relief after which he initiated these habeas corpus proceedings.

III. PROCEDURAL BACKGROUND

When Branch petitioned for post-conviction relief in the state courts he based his petition, among other grounds, on multiple claims of ineffective assistance of trial counsel. Branch included with his petition to the PCR court sworn statements predating the start of his trial from the two potential witnesses. Their statements tended to corroborate Branch's trial testimony, but Branch's trial counsel did not call them to testify.

In a "certification of oath" dated August 10, 1994, one of the uncalled witnesses, Abdul Samee, essentially verified Branch's account of the events at the time of the shooting, in

11

particular that (1) Branch went to 260 Prince Street to obtain a refund for the $50 he spent for fake cocaine, (2) Mosley's shooting was accidental, and (3) Branch fled with Lee's gun. The other uncalled witness, Stan Robinson, gave a more cryptic statement, signed on August 1, 1994, averring that Murphy said that Lee "was selling beat cocaine because she fuck Geoge [sic], money up," J.A. 346, apparently meaning that Lee had lost money for her boss, George Phillips, and was selling inferior or bad cocaine to make up for it.

Although the state PCR court orally found trial counsel's decision not to call the two witnesses "more troubling" than other issues Branch raised in his petition, J.A. 362, it concluded that Branch had not established a prima facie case for relief, a prerequisite for a PCR court to require an evidentiary hearing on the petition. The court explained that trial counsel chose to call certain witnesses who "stood for the proposition for which they were called," J.A. 363-64, and the additional witnesses only could have repeated the same "cumulative" testimony, J.A. 364. The PCR court concluded that even if Branch's counsel had called the witnesses there was no "reasonable probability that the outcome would have been different." J.A. 364.

The PCR court adhered to its oral ruling in a subsequent written opinion but added that it believed that Branch's trial counsel must have made a strategic determination with respect to the use of the two potential witnesses. First, the court repeated its belief that the proposed testimony from the two witnesses would not have changed the result at the trial because it would have covered the same ground as Davis's and Barnhill's testimony. The PCR court believed that Davis

12

offered information that the uncalled witnesses could not have offered. Second, the court held that trial counsel's omission in not calling these witnesses was potentially strategic. The court did not set forth the details of the purported strategy beyond paraphrasing the State's argument that "it is possible that neither of the proposed witnesses [was] available to the defense attorney at the time of trial or that perhaps they had prior criminal records that would damage their credibility." J.A. 374.

The Appellate Division affirmed the order denying PCR relief "substantially for the reasons expressed" by the PCR court. J.A. 385. With respect to most of Branch's claims of ineffective assistance of counsel, including the claim based on counsel's failure to call Robinson and Samee as witnesses, the court stated only that the arguments were "without sufficient merit to warrant discussion in a written opinion."[2] J.A. 385.

Following the exhaustion of his state remedies, Branch filed a pro se habeas corpus petition in the District Court. In the habeas corpus proceedings, Branch claimed, as he had in the

---

[2]The Appellate Division did reverse the PCR court on one ground not at issue here: it remanded the case to the PCR court for an evidentiary hearing on Branch's claim that his counsel had been ineffective for not requesting a charge of passion/provocation manslaughter. The PCR court held a hearing on this issue at which Branch's trial counsel testified. The PCR court subsequently rejected this claim and, on appeal, the Appellate Division affirmed; the New Jersey Supreme Court denied Branch's petition for certification including on the effective assistance of claim at issue here.

PCR court, that his trial counsel had been ineffective because he failed to investigate the two witnesses even though Branch, prior to the trial, had provided their statements to him along with information about their whereabouts. J.A. 409-12. The District Court denied Branch's petition, quoting extensively from the PCR court's opinion without substantially expanding on it. Rather, it simply indicated that the state courts properly identified and applied the governing Supreme Court standard as set forth in Strickland and "[t]he decisions of the state courts were not based on an unreasonable determination of the facts based on the evidence presented to them." J.A. 30. The District Court denied Branch a certificate of appealability, but on September 25, 2013, we granted Branch a certificate of appealability and directed that counsel be appointed to represent him.[3]

## IV. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction over Branch's habeas petition under 28 U.S.C. § 2254; we have jurisdiction under 28 U.S.C. §§ 1291 and 2253. Because the District Court did not hold an evidentiary hearing and, instead, based its decision on its review of the state court record, we apply a plenary standard of review of its decision and order. Duncan v. Morton, 256 F.3d

---

[3] We note that students from Duke University School of Law have represented Branch on this appeal with great skill. We thank them—and Elyse Lyons, who argued this appeal, in particular—for this fine representation.

189, 196 (3d Cir. 2001).

Even though our review of the District Court's order is plenary, we analyze the state PCR court's decision with considerable deference. Congress, by its enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), 28 U.S.C. §§ 2241-2254, which is applicable to this case, significantly limited the federal courts' power to grant a writ of habeas corpus. Thus, under the AEDPA a district court may grant a petition for habeas corpus based on a claim that a state court previously had rejected on the merits only if the state court's adjudication of the petitioner's claim had been "based on an unreasonable determination of the facts in light of the evidence presented," 28 U.S.C. § 2254(d)(2), or, as is more pertinent to this appeal, if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1).

A state court's decision is "contrary to clearly established federal law if it (1) contradicts the governing law set forth in [the Supreme] Court's cases or (2) confronts a set of facts that are materially indistinguishable from [those in] a decision of [the Supreme] Court and [the state court] nevertheless arrives at a [different] result." Outten v. Kearney, 464 F.3d 401, 413 (3d Cir. 2006) (first, third, and fifth alterations in original) (internal quotation marks omitted). A state court decision unreasonably applies clearly established law if it either "unreasonably applies [the law] to the facts" of the case or "unreasonably extends," or fails to extend, Supreme Court precedent in the case before it. Id.

15

Congress has effectuated its intention to limit the circumstances in which a federal court may grant a writ of habeas corpus by requiring a petitioner to surmount a high barrier as a prerequisite for the court to grant him the writ. As the Supreme Court has put it, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, __ U.S. __, __, 131 S.Ct. 770, 786 (2011) (internal quotation marks omitted).

Nevertheless, if the state courts unreasonably applied federal law in rejecting Branch's petition, the District Court should have reviewed Branch's ineffective assistance of counsel claim de novo. See Breakiron v. Horn, 642 F.3d 126, 138 (3d Cir. 2011); see also Panetti v. Quarterman, 551 U.S. 930, 953, 127 S.Ct. 2842, 2858 (2007) ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires."); Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

## V. DISCUSSION

The governing standard for ineffective-assistance-of-

16

counsel claims emanates from the seminal decision in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052 (1984). <u>Strickland</u> supplied a two-prong test: counsel's performance must have been deficient and this deficiency must have prejudiced the defense. In this case, no court, state or federal, has held an evidentiary hearing at which Branch's trial counsel had an opportunity to explain why he did not call Robinson and Samee to testify at the trial as exculpatory witnesses.[4] Accordingly, we

---

[4] We note that Branch claimed before the PCR court and the District Court that his trial counsel failed to interview and investigate potential witnesses Samee and Robinson properly. <u>See</u> Mem. of Law in Support of Habeas Corpus Relief 20-28; Appellant's Consent Motion to Modify the Record. Da51-52, 89-91. He also raises this issue in passing in his brief on appeal. Appellant's br. at 51. The PCR court found that Branch had "failed to meet his burden of providing competent evidence that trial counsel's representation was in any way deficient." J.A. 373. Specifically, it noted that nothing existed "to suggest . . . that the decisions of trial counsel were" uninvestigated. J.A. 373. Branch does not argue on appeal that the PCR court erred in placing the burden on him to show a prima facie case of ineffective assistance under <u>Strickland</u>. Nor do his briefs cite any evidence in the record to support his claim that his trial counsel failed to investigate Samee and Robinson properly. Indeed, he concedes that counsel may have interviewed the witnesses. <u>See</u> Appellant's br. at 51 (noting that an evidentiary hearing could resolve factual issues such as "whether counsel interviewed the witnesses"). However, we must determine whether the state court reasonably applied <u>Strickland</u> based on the bare record before it, which, as far as we are aware, did not

17

must ground our decision on the bare record developed in the state courts.[5]

On the record as it now stands, we cannot find any justification for counsel not calling these two individuals as witnesses at Branch's trial. The record does not support the PCR court's conclusion that trial counsel may have had legitimate strategic reasons for not calling these witnesses and therefore its conclusion was an unreasonable application of Strickland. We also find that there is a reasonable probability that this omission prejudiced Branch because if those potential witnesses had testified consistently with their pretrial statements, the verdict could have been different at Branch's criminal trial. As we conclude that no fair-minded jurist could disagree with our finding that the PCR court's conclusion was incorrect, Harrington, ____ U.S. at ____, 131 S.Ct. at 786, we also find

contain any evidence of trial counsel's efforts—or lack thereof—with respect to investigating or interviewing the witnesses. See Cullen v. Pinholster, __U.S.__, __, 131 S.Ct. 1388, 1398 (2011). "[T]he absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" Burt v. Titlow, __ U.S. __, __, 134 S.Ct. 10, 17 (2013). Given these limitations, we believe it appropriate to focus only on what we know: that Branch's trial counsel did not call Samee and Robinson to testify at trial.

[5] Branch's trial counsel did testify at an evidentiary hearing in the PCR court, but on a different issue than that with which we are concerned. See supra note 2.

that the PCR court's conclusion was an unreasonable application of Strickland.  Accordingly, Branch has satisfied the "unreasonable application" prong of 28 U.S.C. § 2254(d)(1).

A. Deficient Performance

Although the state PCR court grounded its decision primarily on Strickland's prejudice prong, we begin our analysis by examining counsel's performance at trial.  To obtain habeas corpus relief, Branch must show that his counsel's performance was so inadequate that he "was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment," Strickland, 466 U.S. at 687, 104 S.Ct. at 2064, and that the PCR court's failure to so conclude was an unreasonable application of Strickland. Strickland's test is demanding as there is a "strong" presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  Burt v. Titlow, __ U.S. __, __,134 S.Ct. 10, 17 (2013).  Even when the petitioner can point to evidence supporting a conclusion that in some respects counsel was deficient, the standard for prevailing under the first prong of Strickland remains stringent:  a petitioner must establish that, "in light of all the circumstances," counsel's mistake was so egregious that it fell "outside the wide range of professionally competent assistance."  Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.  A court must assess "counsel's reasonableness . . . on the facts of the particular case, viewed as of the time of counsel's conduct."  Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005).

Where, as here, the petitioner claims that his counsel had been ineffective for failing to call potentially important

19

exculpatory witnesses, the assessment of trial counsel's judgment requires another layer of deference: we are "required not simply to give [the] attorney[ ] the benefit of the doubt, but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as [he] did." Cullen v. Pinholster, __U.S.__, __, 131 S.Ct. 1388, 1407 (2011) (first alteration in original) (internal quotation marks and citation omitted). Thus, the nexus of the AEDPA and Strickland compels us to be "doubly deferential," and "give[] both the state court and the defense attorney the benefit of the doubt." Burt, __ U.S. at __, 134 S.Ct. at 13 (quoting Pinholster, __ U.S. at __, 131 S.Ct. at 1403.)

Branch argues that his trial counsel provided him with unreasonably deficient representation when he failed to call Samee and Robinson as witnesses at his trial. Branch claims that taken together, these potential witnesses could have: (1) corroborated his account of the events at 260 Prince Street at the time of the shooting, and (2) discredited the State's witnesses who contradicted his version of the events. Specifically, Branch contends that Samee, as one of his only two eyewitnesses to the shooting—the other being Davis—would have confirmed that Lee pulled out the nine millimeter gun, and that its discharge was accidental. Samee also would have explained that Lee obtained a second, smaller gun by running upstairs and retrieving it.

Robinson, for his part, would have given evidence impeaching one of the State's witnesses, Murphy, with a prior inconsistent statement. Robinson would have testified that, contrary to Murphy's statements at trial, Murphy told Robinson

20

that Lee was selling "beat cocaine" and that Branch entered 260 Prince Street to complain about that cocaine. Robinson also would have given evidence that Lee, not Branch, drew a gun, and that Branch fled with that gun.

Branch contends that these witnesses' statements did not repeat testimony presented at trial—because, as described above, these witnesses could have offered information that other witnesses did not—and their testimony was not "cumulative" because it went to a "central and hotly contested issue." Appellant's br. at 33. He supports the latter assertion with our opinion in United States v. Bergrin, in which we observed that testimony that would have "added much to the probative force of the other evidence in the case and contribut[ed] to the determination of truth . . . cannot properly be said to be cumulative." 682 F.3d 261, 280 n.23 (3d Cir. 2012) (alteration in original) (internal quotation marks omitted).

On the record before the state court, we see no reason why Branch's trial counsel did not call the potential witnesses at Branch's trial. The PCR court's conclusion that trial counsel's decision not to call these witnesses was an exercise of reasonable trial strategy was an unreasonable application of federal law. After all, rather than addressing matters that were peripheral or that other testimony covered adequately and conclusively, Samee's and Robinson's written statements addressed matters that at trial were both sharply disputed and critical. See Brown v. Wenerowicz, 663 F.3d 619, 631 (3d Cir. 2011) (finding that testimony about a fact conceded by the prosecution and consistent with its theory of the case was cumulative); United States v. Williams, 81 F.3d 1434, 1443 (7th

21

Cir. 1996) (defining "cumulative evidence" as evidence that "adds very little to the probative force of the other evidence in the case, so that if it were admitted its contribution to the determination of truth would be outweighed by its contribution to the length of the trial").

The situation here is similar to that which we considered recently in Grant v. Lockett, in that we face the question of why having another "eyewitness testify that the defendant was not the shooter would have been 'cumulative.'" 709 F.3d 224, 239 (3d Cir. 2013) (reversing denial of a habeas petition on the ground of ineffective assistance of counsel). In Grant, the defendant was convicted of murder primarily on the basis of the testimony of one eyewitness. Id. at 227. But two other eyewitnesses contradicted this testimony and testified that the defendant was not the shooter. Id. There were two more witnesses who also would have denied that the defendant was the shooter but the defense attorney did not call them to testify. Id. at 227-28. The district court concluded that this additional testimony would have been "cumulative" because it would have repeated the testimony of other witnesses. Id. at 239. But the uncalled witnesses had executed affidavits that exonerated the defendant and went to the very heart of the prosecution's case by identifying another person as the shooter. Id. at 239-40.[6]

---

[6] See also Toliver v. Pollard, 688 F.3d 853, 862 (7th Cir. 2012) (finding counsel's performance deficient where he failed to call two eyewitnesses related to defendant who could have corroborated his account and impeached prosecution's witness); Washington v. Smith, 219 F.3d 620, 634 (7th Cir. 2000) ("Washington's whereabouts on the day of the robbery was far

The testimony of the two uncalled witnesses in Branch's case was almost as significant. Indeed, it is difficult to see how the jury could have returned a guilty verdict against Branch on the homicide charges if it credited their testimony.

The State counters that Branch's defense theory left one void—what it calls "the crux of the case"—that neither witness could have filled: a plausible explanation for why Branch would have entered 260 Prince Street unarmed to demand a refund from hardened drug dealers, surely a perilous undertaking. Appellees' br. at 21-22. In these circumstances, the jury could have doubted the credibility of Branch's explanation of why he entered the building. Yet even though Branch contends that he followed what was an obviously dangerous path when he entered 260 Prince Street, he also reasonably contends that competent counsel would not have withheld testimony that would have provided critical details corroborating his account of the events at the time of the shooting.

In addition to challenging the plausibility of Branch's defense as part of its argument that Branch's counsel's representation of Branch was not deficient, the State offers several other explanations why trial counsel did not call the potential witnesses, but we do not find any persuasive. In considering these explanations, as we mentioned above, we must go beyond giving trial counsel "the benefit of the doubt" as

from established—it was <u>the</u> issue in the case. The fact that Pickens had already testified to facts consistent with Washington's alibi did not render additional testimony cumulative.").

23

we are required to "affirmatively entertain" counsel's potential reasons for not calling Samee and Robinson as witnesses. Pinholster, __ U.S. at __, 131 S.Ct. at 1407. But the State's attempts fail because "courts may not indulge post hoc rationalization for counsel's decisionmaking that contradicts the available evidence." Harrington, __U.S. at __, 131 S.Ct. at 790.

Purporting to retrace counsel's steps, the State argues that Samee's testimony would have been inconsistent with Branch's explanation of what happened. It explains that, in summation, Branch's counsel argued that his client was asking for a return of his money in a reasonable way, hoping that the dealer was "honorable." Samee, on the other hand, in his statement described an assertive Branch who threw the bad cocaine on the floor with a warning that no one should buy it.

Yet Samee's statement is not inconsistent with Branch's testimony. At trial, Branch did not describe himself as a particularly amicable visitor offering pleasantries and charm in seeking his refund. Instead, he said that he burst in and demanded to know who sold the "beat" drugs: "the first thing I said when I went inside was who Murphy came in here and got some cocaine from and then they just looked at me like I was crazy." J.A. 263. Moreover, if Samee repeated the contents of his written statement when testifying, trial counsel could have adjusted his closing statement to conform with the evidence. In any event, regardless of possible inconsistencies between trial counsel's argument and Samee's statement, the inconsistencies are insignificant when compared to the importance of Samee's testimony to Branch's defense as Samee's account of Branch's entry into 260 Prince Street corroborated Branch's testimony on

24

that point.

The State's explanation for why Branch's counsel did not call Robinson as a witness is even weaker. The State finds contradictions where we do not—between Robinson's statement that Branch "got the gun out of her hand" and Branch's recollection that he heard the gun drop. Appellees' br. at 24-25. Yet the State concedes that the accounts can be reconciled. Id. at 24 (allowing that Robinson "could have meant Branch knocked or forced [the gun] out of her hand"). We agree. And again, even if this statement had been inconsistent with Branch's testimony, the value of Robinson's statements outweighs the significance of the differences. That is particularly true as Robinson was not an eyewitness and merely was recounting what Murphy had told him, thus making his description of how the gun was displaced from Lee's hand understandably imprecise and much less significant than his recitation of Murphy's admission.[7]

---

[7] As the State correctly points out, Robinson's testimony at least would have impeached Murphy's testimony, which is significant as Murphy was a key witness for the prosecution. We note also that when the trial court admitted Barnhill's testimony it overruled the prosecution's hearsay objection and thus it allowed Barnhill to describe what Lee had told him about the incident. We see no reason why trial counsel, after having cleared the hearsay hurdle once, would have withheld Robinson's statement out of a concern that the court would not have admitted it for the truth of its content.

25

The same is true of the tension that the State finds between the witnesses' statements that Branch grabbed Lee's gun and Branch's testimony that he grabbed her wrist and took her gun after she dropped it. <u>Id.</u> at 25. The witnesses' brief statements essentially summarized Branch's more detailed account. Branch described step by step how he came to possess Lee's gun; Samee and Robinson stated more succinctly that Branch grabbed Lee's gun, omitting the intermediate step that he grabbed her wrist first and that the gun discharged while they struggled. Though it is true that Samee's statement did indicate that Branch "grabbed the gun to get it out of [Lee's] hand," J.A. 344, it would be expected that essentially consistent accounts of the event would vary to some degree given the chaotic situation at 260 Prince Street. Overall, we see little or no inconsistency between Branch's account on the one hand and Samee's and Robinson's more abbreviated accounts on the other hand.

Thus, the record as it was developed in the state courts disclosed no reason—strategic or otherwise—to support trial counsel's failure to call Samee and Robinson as witnesses. Their pretrial statements tended to exculpate Branch and aligned almost perfectly with Branch's account of what happened at 260 Prince Street. The PCR court's conclusion that trial counsel's decision not to call these witnesses was a reasonable trial strategy was an unreasonable application of federal law. Consequently, we continue on and analyze whether counsel's performance could have prejudiced Branch at the trial.

B. <u>Prejudice</u>

26

In the PCR court's evaluation of the prejudice question, Strickland required it to determine whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. at 2068. Branch was not required to establish that his "counsel's deficient performance more likely than not altered the outcome of the case"; he only must have shown "a probability sufficient to undermine confidence in the outcome." Grant, 709 F.3d at 235 (internal quotation mark omitted). We look to the "totality of the evidence at trial," meaning that "a verdict . . . only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Id.

We often have said that this standard is not "stringent." See, e.g., Thomas v. Varner, 428 F.3d 491, 502 (3d Cir. 2005). In fact, it is "less demanding than the preponderance standard." Jermyn v. Horn, 266 F.3d 257, 282 (3d Cir. 2001). See also Woodford v. Visciotti, 537 U.S. 19, 22, 123 S.Ct. 357, 359 (2002) (observing that Strickland "specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered"). But see Harrington, __ U.S. at __, 131 S.Ct. at 792 ("[T]he difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case." (internal quotation marks omitted)). At the same time, as the Supreme Court recently cautioned, the "likelihood of a different result must be substantial, not just conceivable." Id. at __, 131 S.Ct. at 792. We therefore ask whether the state courts unreasonably concluded that there was not a substantial likelihood that Samee's and Robinson's testimony would have

27

changed the outcome of Branch's trial.

We start our prejudice analysis by pointing out that no fair-minded jurist would agree with the state courts' finding that Samee's and Robinson's testimony would not have materially aided Branch's case. These witnesses would have verified Branch's account of what happened at 260 Prince Street and undermined the State's case, which, even in the absence of their unheard evidence, was far from airtight. But our prejudice analysis goes beyond considering the significance of the missing evidence for, in accordance with Grant's admonition, we go on to consider the record as a whole so that we can evaluate the weaknesses in the State's case. See Grant, 709 F.3d at 238.

The State called witnesses who stated that Lee thought she had shot Mosley. This testimony is difficult to square with the prosecution's theory of the case, particularly when coupled with Lee's account placing both Mosley and Branch by the door, and Dr. Obe's testimony that at least one of Mosley's wounds was inflicted from a gun not fired at close range. The image that the prosecution painted was one of Mosley getting caught in the crossfire—after he inexplicably reentered a hallway in which Branch already had fired a shot—standing in between Lee and Branch, but much closer to Branch than to Lee. But Mosley's wounds suggested that he more likely was struck by a shot that Lee fired, as she was the shooter at a greater distance from Mosley.[8]

---

[8]We do not have the benefit of a diagram that Lee drew at trial that purported to demonstrate the positions of all the individuals

28

The State's case had other weaknesses. All of its eyewitnesses to the events at 260 Prince Street had criminal records. Indeed, perhaps sensing the jury's unease with his witnesses, the prosecutor reminded it in summation that "when you cast a play in hell you don't have angels for characters." J.A. 303. Lee, who seems to have been the prosecution's most important witness, had used 15 aliases and has a criminal history reflecting the commission of violent crimes. Moreover, it is fair to infer that Lee knew that she stood to benefit in two ways from Branch's conviction. First, because she was testifying under a grant of use immunity, she surely knew that if the jury convicted Branch it would have validated her testimony. Second, she must have recognized that if Branch was convicted her bargaining position would have been enhanced in the other pending cases in which she was a defendant.

Another weakness in the State's case was that one of its critical witnesses, Murphy, was Lee's underling, and a heroin addict to boot, who admitted to consuming a "bag, bag and a half [of heroin] a day." J.A. 85-86. It is fair to infer that Murphy was motivated to vouch for Lee's version of the events, in which she had a secondary role in Mosley's shooting. And the State's witnesses had the opportunity to harmonize their testimony as they admitted to discussing the events with one another prior to their police interviews.

In addition, the physical evidence was inconclusive and even might have favored Branch. We recognize that, when arrested, Branch had the weapon used to shoot Mosley, though

in the hallway.

he offered an explanation of why he nevertheless did not shoot Mosley.  In any event, inasmuch as the prosecution's theory included a scenario in which there had been a gunfight between Lee and Branch, rather than, as Branch argues, that two shots had been fired from Lee's gun that struck Mosley, the jury understandably expected the police to find bullet strikes in the walls from Lee's smaller gun.  When the jury sent the trial court a question asking whether the police found "the bullets strike anywhere," J.A. 323, 329, the court indicated to trial counsel that it would respond that it did not "know of any such testimony," J.A. 323, but that the jury would have to rely on its own recollection of the evidence on the point.  In fact, the police did not find any bullet strikes.

There was yet another physical evidence problem for the State because, according to Lee, Branch fired a warning shot when he entered 260 Prince Street, and then fired two more shots that he aimed at Lee but that struck Mosley.  But the police recovered only two shell casings and did not recover any bullet strikes.  Judging by the jury's question to the court the jury was aware of the missing shell casing and bullet strike problem.

We recognize that in summation at trial and in its brief on appeal, the State points to the straight paths that the two bullets took through Mosley's body.  The State argues that these paths of the bullets refute Branch's assertion that the gun discharged as he and Lee were falling to the floor because if that were true, the argument goes, the bullets would have struck Mosley at an angle.

We are not convinced by this logic and note that, as far as

30

we can tell, the State did not make this argument at trial and, in any event, did not support it with expert testimony. Moreover, even if a gun is likely to be angled up or down when the person holding it is falling, this is not necessarily so as the barrel might remain level when the gun drops with the person holding it. Here, if anything, the autopsy undercuts the State's theory because Mosley's two wounds were separated significantly in height, one hitting his lungs and the other the back of his knee. The State has not explained how Branch's gun could have caused these non-angled bullet wounds while Branch was allegedly shooting Lee from about ten feet away.

And for all of the State's efforts to find inconsistencies in Samee's and Robinson's statements, it was the State's case that was plagued by serious contradictions. The State admits to some of these inconsistencies but dismisses them as not going to the "major element" of the case. Appellees' br. at 32 (acknowledging that the "prosecution witnesses had various inconsistencies").

Though we recognize that it is not surprising that the witnesses did not describe the chaotic events at 260 Prince Street consistently in every detail, still some of the contradictions in the State's case give us pause. For instance, Lee unequivocally testified that, contrary to Murphy's account, Murphy did not enter 260 Prince Street with Branch, and that she, in fact, did not even know him. That evidence, was, of course, at odds with Murphy's testimony that he was there and that he even discussed the incident with Lee "not too long after it happened." J.A. 105. Whether Murphy—an important participant in the State's version of the events and an

31

eyewitness—was actually in the building at the time of the shooting was quite relevant to the State's case.

Dortch, for his part, repeatedly struggled to keep his testimony consistent with his prior statements to the police and to the grand jury as he acknowledged, over and over, that his earlier accounts had been inaccurate. The jury evidently took note of his vacillation because effectively it discredited him when it acquitted Branch on the robbery counts as the State based its case on those counts heavily on Dortch's testimony.

Though we have approached our analysis of the PCR court's decision on the prejudice prong of Strickland by assessing weaknesses in the State's case, we are not implying that Branch's defense was strong. After all, he tried to convince the jury that he entered a drug den unarmed to seek a refund for his purchase of fake cocaine, that he lunged at a gun that was about to be discharged, and that he had possession of the murder weapon when the police arrested him only because he grabbed the weapon when the real culprit dropped it. And Branch's two witnesses were felons, brought to the courthouse to testify directly from prison. One of them, Davis, used many different names, and, after telling the jury that Branch did not rob anyone, he admitted that he, Davis, had been convicted of attempted burglary, among other offenses.

Nevertheless, for purposes of undermining confidence in the trial's outcome Branch's defense was no less plausible than the defense that we accepted as sufficient in a similar context in Rolan v. Vaughn, 445 F.3d 671 (3d Cir. 2006). There, trial counsel did not call a witness who would have testified that the

32

defendant, Florencio Rolan, entered an abandoned building armed only with a beer bottle to use against the eventual victim who was wielding a kitchen knife. Id. at 682-83. This testimony would have bolstered Rolan's improbable claim at trial that when he entered the building he saw a "loaded rifle lying nearby," which he picked up to kill the victim in self-defense. Id. at 674, 683. We "marvel[ed] at Rolan's serendipitous rifle" but we saw enough holes in the prosecution's case for Rolan to have satisfied Strickland's prejudice inquiry when focusing on trial counsel's failure to call the beer bottle witness at trial, rendering the state court's conclusion to the contrary unreasonable on habeas corpus review. Id. at 683. By comparison, Branch's defense, while also a bit strained, is more believable than Rolan's.

Given the weaknesses in the prosecution's case and our conclusion based on their statements that Samee and Robinson would have materially aided Branch's case, we find that fair-minded jurists would not disagree that there was a reasonable probability that Samee's and Robinson's testimony at trial would have changed the jury's verdict. Accordingly, in the absence of an explanation from Branch's trial counsel as to why he did not call Samee and Robinson as witnesses, we find the state courts' application of Strickland's second prong to have been unreasonable. As a result, the District Court should have made a de novo review of Branch's ineffective assistance claim.

C. Evidentiary Hearing

We are satisfied from our review of the case that the

District Court, when reviewing Branch's ineffective assistance of counsel claim, should have conducted an evidentiary hearing and that it abused its discretion when it failed to do so. See Grant, 709 F.3d at 229 (reviewing district court's "denial of an evidentiary hearing for abuse of discretion"). We are aware that 28 U.S.C. § 2254(e)(2) bars federal habeas corpus courts from holding evidentiary hearings if "the applicant has failed to develop the factual basis of a claim in State court proceedings." But that prohibition does not apply in this case because Branch unsuccessfully sought an evidentiary hearing in the PCR court and unsuccessfully appealed from the denial of his PCR petition. We therefore cannot attribute the incomplete developments of all the facts to Branch's "lack of diligence, or some greater fault." Thomas, 428 F.3d at 498; see also Hurles v. Ryan, __ F.3d __, __, 2014 WL 1979307, at *19 (9th Cir. May 16, 2014) ("A petitioner who has previously sought and been denied an evidentiary hearing has not failed to develop the factual basis of his claim.").

Relatedly, the Supreme Court recently held that new evidence produced in a hearing before a habeas corpus court may not be used to assess whether the state court's decision satisfied 28 U.S.C. §2254(d)(1), that is, whether it was "contrary to, or involved an unreasonable application of, clearly established Federal law." See Pinholster, __ U.S. at __, 131 S.Ct. at 1398. In other words, for purposes of clearing the § 2254(d)(1) bar to obtain a writ of habeas corpus, the record on which a court decides the case ordinarily is frozen when the case leaves the state-court system. But this prohibition against expanding the state-court record in a federal court does not affect the proceedings on Branch's petition because, at an

34

evidentiary hearing in the District Court, Branch will rely on the witnesses' pretrial statements that he submitted to the PCR court. Thus, in seeking habeas corpus relief, Branch does not base his case on facts that he believes could be developed at a hearing in the habeas corpus court.

As we have explained, we can discern no reason on the current record to support counsel's decision not to call Samee and Robinson as witnesses to testify at trial. Nevertheless, because a determination of whether to grant Branch's petition turns on the reasons why his counsel did not call Samee and Robinson to testify and those reasons have not been developed in the record, an evidentiary hearing is required here. See, e.g., Wilson v. Butler, 813 F.2d 664, 672 (5th Cir. 1987) (remanding for evidentiary hearing because the record did not reflect whether trial counsel made a reasonable strategic decision not to present certain evidence); see also Thomas, 428 F.3d at 501 ("Of course, overcoming the strategic presumption does not, in itself, entitle Thomas to relief. It merely gives him the opportunity to show that counsel's conduct fell below objective standards of attorney conduct.").[9]

---

[9] We note that if the state courts had concluded without an evidentiary hearing that Branch's trial counsel's performance had been deficient but nevertheless had denied Branch PCR relief because he did not satisfy the prejudice prong of Strickland, it is possible that we would have granted Branch's petition without ordering that the District Court hold an evidentiary hearing. See Browder v. Dir., Dep't of Corr., 434 U.S. 257, 267 n.10, 98 S.Ct. 556, 562 n.10 (1978) (observing

At the hearing Branch's trial counsel will be able to explain the circumstances surrounding his decision not to call Samee and Robinson as witnesses. In this regard, we point out that he might have interviewed them and concluded that their accounts deviated in significant respects from their written statements. Furthermore, it is possible, as the State seems to suggest, that the witnesses did not want to testify and that Branch's counsel may have thought that it would be risky to call them to do so. But to the extent that the state courts adopted theoretical justifications for Branch's counsel not calling Samee and Robinson as witnesses, the courts lacked a factual basis for doing so and we will not allow the outcome of this case to depend on sheer speculation. We are satisfied, instead, that the District Court should have reviewed Branch's claim on a de novo basis after considering the evidence developed at an evidentiary hearing along with the rest of the record before the Court.

---

that courts of appeals have permitted district courts to "discharge a habeas corpus petitioner from state custody without conducting an evidentiary hearing"); Noble v. Kelly, 246 F.3d 93, 101 (2d Cir. 2001) (holding that a remand for an evidentiary hearing was unnecessary in part because the record negated the possibility that counsel's omission was strategic); Fed. R. Governing § 2254 Cases 8 advisory committee's note (commenting that in "unusual cases the court may grant [a habeas petition] without a hearing"). As the case stands, however, there are factual questions that must be resolved concerning the first Strickland prong before the District Court may adjudicate the habeas corpus petition.

## VI. CONCLUSION

For the foregoing reasons, we will vacate the District Court's February 11, 2013 order denying Branch's petition for habeas corpus relief and will remand the case to the District Court for an evidentiary hearing on Branch's petition for a writ of habeas corpus.